CLARENCE MOUZONE *v.* STATE OF MARYLAND

[No. 153, September Term, 1981.]

*Decided December 2, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Gary S. Offutt, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Ann E. Singleton, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

COLE, J., delivered the opinion of the Court.

We shall in this case determine whether a statement given to police by a witness to a double murder five hours after the incident took place and after almost two hours of questioning by a police officer falls within any exception to the rule against hearsay. We set forth the facts crucial to our discussion of the issue.

At approximately two o'clock in the afternoon of August 31, 1979, Anna Byrd happened to be in the vicinity of North Avenue and Charles Street in Baltimore City. While there she heard a loud noise, similar to a car back-firing. She turned around to see a woman lying on the sidewalk and a man staggering, and then fall, partially on the sidewalk and

partially in the street. She also saw a man run past her, leaving the scene.

Officer Michael Sabo of the Baltimore Police Department responded to North Avenue and Charles Street a few minutes later. Upon arrival he found Carolyn Williams and Bernard Banks lying on the sidewalk, both with apparent gunshot wounds, and Anna Byrd having an epileptic seizure. Byrd was taken from the scene to the hospital where she was treated for her seizure. Williams and Banks suffered fatal injuries.

Byrd remained at the hospital for approximately three hours, part of which time she was unconscious. Upon regaining consciousness she was given medication, discharged, and then taken to the Baltimore City Police Headquarters Building where she was interviewed by Detective Danko of the Homicide Division. The interview began at 5:28 p.m.

During the course of the interview, Byrd was shown several photographs and asked if she could identify any of the men depicted therein as the one she saw running from the shooting. She picked out the picture of Clarence Mouzone. She also answered a series of questions about the incident which was reduced to writing and signed by her. The statement concluded with the question "After you read this statement and find it true and correct, will you sign it?" Immediately thereafter appear Detective Danko's annotation that the statement was concluded at 7:10 p.m. and Anna Byrd's signature and annotation that it was signed at 7:20 p.m.

Subsequently, Mouzone was arrested and the case came to trial. During the trial the State called Byrd to the stand. Seeking to introduce the statement Byrd had given to the police, the prosecutor asked whether the statement was truthful as far as she knew at the time it was given. Byrd replied in the negative. The prosecutor thereupon directed a series of questions to Byrd, attempting to establish that the statement accurately represented the facts as Byrd knew them at the time she related them which, he contended,

would be sufficient to allow him to introduce the statement as past recollection recorded. He so moved and the trial judge reserved her ruling to allow defense counsel the opportunity to cross-examine Byrd.

The defense counsel sought to attack the admissibility of the statement as being coerced and therefore inadmissible. Accordingly, he moved to have an evidentiary hearing out of the presence of the jury to determine its voluntariness. The trial judge granted the motion.

At this voluntariness hearing, the prosecutor called to the stand Detective Danko. He testified that before he began questioning her she was trembling and shaking but that by the time he started questioning her (he talked to her ten to fifteen minutes before the statement) she had settled down: "she had lost that shakiness, and she was more responsive and slower in her speech." He further testified that she was calm and cooperative.

Anna Byrd was also called to the stand during this hearing. After repeatedly asserting that Mouzone was not the man she saw running from the scene of the murders, she somewhat equivocally admitted that the statement reflected the truth as she knew it when the statement was signed. She also testified that although she was nervous, shaken, and still suffering some of the effects of her seizure, she had calmed down a "little bit" while talking to the police officer. The trial judge ruled that, as Byrd had "reluctantly, obviously, said several times that [the statement] was true or she thought it was true at the time she gave it," the statement was admissible as past recollection recorded and determined that any question as to voluntariness went to the weight of the evidence, and therefore was a jury question.

Mouzone was subsequently convicted of two counts of first degree murder and related offenses and sentenced to two consecutive life sentences plus two concurrent fifteen year sentences to run consecutive to the life sentences and two three-year sentences, concurrent with each other and the other sentences. He appealed his convictions to the Court of

Special Appeals, contending, *inter alia,* that the statement was not admissible as past recollection recorded and that it was inadmissible because involuntary. The Court of Special Appeals affirmed, *Mouzone v. State,* 50 Md. App. 81, 436 A.2d 916 (1981), holding that the statement was admissible, but not as past recollection recorded. The intermediate appellate court found that because the statement was not offered by the witness who desired to use it, it could not be a past recollection recorded. However, the court did find that the facts of the case would support the admissibility of the evidence under the excited utterance or *res gestae* exception to the hearsay rule. The intermediate appellate court concluded that Byrd was still suffering from the shock of what she had seen and experienced, impairing her reflective capabilities, thus making her statement contemporaneous with the commission of the crime, and thereby lending an aura of trustworthiness to the contents of her declaration. We granted Mouzone's petition for certiorari.

Mouzone contests the holding of the Court of Special Appeals on three grounds. First, he maintains that the requirements of the excited utterance exception have not been satisfied, pointing out that the statement was given five hours after the exciting event, after two hours of questioning, and contains language to the effect that it was reviewed and understood by the declarant. He next contends that the statement was coerced and, therefore, inadmissible.[1] He lastly asserts that the statement was not within the exception encompassing extrajudicial identification.

Hearsay, as a rule, is withheld from consideration by the factfinder because of its inherent untrustworthiness. Exceptions to the rule usually involve those situations where circumstances lend credibility to the statement, thus vitiating the reason for the rule. The *res gestae* or excited utterance exception is justified on this basis. McCormick, *Evidence* § 288 (2nd ed. 1972). "Evidence of declarations and acts, which are an immediate accompaniment of the act charged

---

1. As we have concluded that the evidence in question is not admissible under the hearsay exceptions here presented, we need not and shall not address this issue.

and so closely connected with the main fact as to constitute a part of it, and without which the main fact might not be properly understood, are admissible as a part of the *res gestae.*" *Wilson v. State,* 181 Md. 1, 3-4, 26 A.2d 770 (1942).

The essence of the excited utterance exception is the inability of the declarant to have reflected on the events about which the statement is concerned. It requires a startling event and a spontaneous statement which is the result of the declarant's reaction to the occurrence. McCormick, *Evidence* § 297 (2nd ed. 1972). The rationale for overcoming the inherent untrustworthiness of hearsay is that the situation produced such an effect on the declarant as to render his reflective capabilities inoperative. *See Wright v. State,* 88 Md. 705, 41 A. 1060 (1898). *See also,* McCormick, *supra,* § 297. The admissibility of evidence under this exception is, therefore, judged by the spontaneity of the declarant's statement and an analysis of whether it was the result of thoughtful consideration or the product of the exciting event.

We propose no precise formula to determine what lapse of time between the exciting event and the declaration is sufficient to exclude an utterance as not being a part of the *res gestae.* Rather we reaffirm our statement in *Wilson v. State, supra,* 181 Md. at 4 that

> The test as to whether a declaration or act offered in evidence is part of the *res gestae* is whether it was contemporaneous with the commission of the crime and so connected with it as to illustrate its character. Whether such a declaration or act is an immediate accompaniment is tested, not by the closeness of time, but by causal connection. A definite limit of time cannot be arbitrarily fixed for the reason that so long as the main transaction continues, declarations and acts emanating from it become a part of it.

A few cases will illustrate this point.

In *State v. Stafford,* 237 Iowa 780, 23 N.W.2d 832 (1946), a woman was severely beaten by her husband in a pasture

some distance from their home. She escaped from her husband and spent the night wandering around in the country. About fourteen hours after the assault she came to the home of some relatives, who did not recognize her, as she had been beaten so badly. When asked what happened, she replied that her husband had tried to kill her. The statement was admitted as part of the *res gestae.* The court noted that the element of time was important "merely as bearing on the question of spontaneity," and held that, under the circumstances, her statement stood "the test of spontaneity, and [was] a natural expression of what had happened to her." *Id.* at 835-36. *See also, Gibbs v. Wilmeth,* 261 Iowa 1015, 157 N.W.2d 93 (1968); *Sadowski v. Eazor Express Inc.,* 213 Pa. Super. 471, 249 A.2d 842 (1968); *May v. Wright,* 62 Wash. 2d 69, 381 P.2d 601 (1963).

Contrasted with *Stafford* is *Neusbaum v. State,* 156 Md. 149, 143 A. 872 (1928). In *Neusbaum* a witness to an automobile accident exclaimed "Oh, he ran right over that man." Then she said, "Get his number" and proceeded to read off the license number of the striking vehicle. The Court noted that the

> first statement was an involuntary exclamation of horror, induced by the shock of seeing a human being run over and possibly fatally injured by an automobile, her second statement was the result of a voluntary investigation made by her for the purpose of ascertaining the identity of the person owning or driving the automobile which caused the injury, and her announcement of the result of her investigation was pure hearsay. [*Id.* at 164.]

*Neusbaum* is useful for our discussion for two purposes. First, it illustrates that time is not dispositive. While fourteen hours may in one case not be too long, a statement made within a few moments of the exciting event could well be. Secondly, the case points out the importance of examining the circumstances *in toto* to determine whether the statement was the result of reasoning and reflection or a spontaneous response to the exciting event. We made clear

in *Neusbaum* that, where the witness had overcome the shock of what she had seen and begun a course of rational and thoughtful conduct, her declarations were no longer excited utterances but rational expressions outside the scope of the hearsay exception.

Another factor to consider, relevant to the inquiry *sub judice,* is whether the statement rendered was blurted out impulsively by the declarant or was the result of questioning by another party. Similar to the time element, the impact of this factor is determined by the situation. Where the circumstances are such that they indicate that the exciting event still dominates the declarant's thought processes, then the answer to a question is admissible. Where, however, the circumstances do not preclude premeditation and consideration, the answer will be inadmissible. A brief discussion of several relevant cases will illustrate this point. *See, generally,* 6 Wigmore *Evidence* § 1750.

In *Stevens v. State,* 232 Md. 33, 192 A.2d 73 (1963), a firefighter discovered the victim tied to a chair in a room which had been set afire by her assailants some two hours prior to her being discovered. In the defendant's trial for murder of the victim, the firefighter was allowed to testify that, without inquiry by him, the victim told him that "she had been beaten by two white men * * * that they had started the fire in the bed and on the chair * * * [and] that they had tied her up." The Court held that "[a]lthough the deceased's statement was made more than two hours after she was beaten, it was 'so closely connected with the main fact as to constitute part of it,' and thus it qualified as part of the *res gestae.*"

In *State v. Berry,* 241 Iowa 211, 40 N.W.2d 480 (1950), a woman witnessed the shooting of her brother. She thought that her husband had killed him because she had seen her husband, who had a gun on his person, wrestling with her brother just prior to the shooting. She called a relative and, after he arrived, she gave a narration of what occurred, some of which was the result of questions asked by the relative. The Court found that the trauma of the event she had witnessed sufficiently dominated her reasoning faculties so that

the spontaneity of her statements were undoubtable and thus admitted testimony as to their content. *Id.* at 483-84. *See also, Cummings v. General Motors Corporation,* 146 Conn. 443, 151 A.2d 884 (1959); *Gibbs v. Wilmeth,* 261 Iowa 1015, 157 N.W.2d 93 (1968); *Myers v. Hagert Const. Co.,* 74 N.D. 435, 23 N.W.2d 29 (1946); *Bosin v. Oak Lodge Sanitary District No. 1,* 251 Or. 554, 447 P.2d 285 (1968); *Sadowski v. Eazor Express, Inc.,* 213 Pa. Super. 471, 249 A.2d 842 (1968); *State v. Bradshaw,* 101 R.I. 233, 221 A.2d 815 (1966); *Management Services v. Hellman,* 40 Tenn. App. 127, 289 S.W.2d 711 (1955); *Ewer v. Johnson,* 44 Wash. 2d 746, 270 P.2d 813 (1954).

In *Weshalek v. Weshalek,* 379 Pa. 544, 109 A.2d 302 (1954), a truck driver had been involved in an accident, had been severely burned, and was in considerable pain. About twenty-five minutes after the accident a police officer arrived and offered to transport the truck driver to the hospital. En route to the hospital the officer questioned the truck driver and elicited from him a narration of events leading up to the accident. Despite the obvious pain the declarant was experiencing, the Supreme Court of Pennsylvania held the statement to be inadmissible hearsay. The court noted that the declarant had an opportunity to reflect on the happening of the accident and his statement "consisted of a considered narration of his idea as to how the accident happened. . . . The account was obviously elicited by prodding, the antithesis of impulsiveness." *Weshalek v. Weshalek, supra,* 109 A.2d at 304.

We turn then to look closely at the facts to determine the extent to which the startling event still dominated the declarant's thought processes at the time of the utterance. Here Byrd had been so influenced by the events she witnessed that she lapsed into a seizure and required medical attention. However, the statement she gave to Detective Danko was commenced three hours later, when, as Detective Danko testified, and which Byrd corroborated, Byrd had begun to calm down. The interview took two hours. Also, it appears that Byrd took the time to read the statement before signing it. (Danko's questioning ended at 7:10 p.m. and Byrd

signed it at 7:20 p.m.). Despite the fact that she may still have been somewhat shaken from the incident, it is beyond credibility to suggest that her coherent and descriptive responses to Danko's questions were impulsive or spontaneous. Rather, we hold that Byrd's statement was the product of thoughtful consideration and thus outside the excited utterance exception to the hearsay rule.

The Court of Special Appeals dismissed the admissibility of Byrd's statement under the past recollection recorded exception to the hearsay rule. We agree. At a minimum, in order to qualify as past recollection recorded, the party who seeks to move the statement into evidence must show some impairment of present recollection. In *Hall v. State,* 223 Md. 158, 162 A.2d 751 (1960), the Court held that in order to be admissible it was not required that the witness have *no* recollection of the recorded events. However, to invoke the exception at all it is axiomatic that the witness must first have demonstrated some impairment of present recollection. As Wigmore puts it, "The situation is one in which a witness, who is either devoid of a present recollection or possessed of an imperfect present recollection, desires to use a past recollection." 3 Wigmore, *Evidence,* § 734.

From a perusal of the transcript in the case *sub judice* it is manifest that Byrd was not claiming any impairment of her ability to recall the particulars of the crime of which she was a witness. Quite to the contrary, her position was that at the time she gave the statement she was shaken, tired, and just wanted to go home, but that since that time she had become certain that the photographic identification she had made was incorrect. Rather than asserting that the recordation would assist her memory or fill in voids caused by time, Byrd was saying that subsequent knowledge had undermined her faith in the trustworthiness of her prior recorded statement. Such circumstances hardly fit the requirements of past recollection recorded.

Finally, the State contends that Byrd's statement is admissible as a prior extrajudicial identification. It is true that the Court in *Basoff v. State,* 208 Md. 643, 119 A.2d 917 (1956) held that an extrajudicial identification is admissible

as an exception to the hearsay rule where the identification was such as to preclude any suspicion of unfairness or unreliability. We reaffirmed that holding recently in *Bedford v. State,* 293 Md. 172, 443 A.2d 78 (1982). However, we did not hold that a statement containing an extrajudicial identification and also other hearsay evidence falling under no exception would be admissible at trial.

We believe our observation precludes the statement from being admitted; it simply contained too much. The statement Byrd gave to Danko asserted that Byrd had witnessed the killing; that she had seen the killer; that he had run past her and in a specific direction; that he was of a particular height and build and wore certain described clothing; that she had selected a particular photograph as being a picture of the man she saw running from the scene of the crime; and that the statement was true and correct. Byrd's statement contained much more than an identification and was thus beyond the scope of this exception.

We hold, therefore, that, since Byrd's statement was hearsay that did not fall within any exceptions to the hearsay rule, it was error for the trial judge to admit the statement as substantive evidence of guilt. Accordingly, we reverse Mouzone's convictions and remand the case for a new trial.

> *Judgment of the Court of Special Appeals reversed and case remanded to that Court with instructions to reverse the judgment of the Criminal Court of Baltimore and remand to that Court for a new trial.*
>
> *Costs to be paid by Mayor and City Council of Baltimore.*