632 A.2d 476

Melvin BAYNE

v.

STATE of Maryland.

No. 229, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Nov. 3, 1993.

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before FISCHER, CATHELL and DAVIS, JJ.

CATHELL, Judge.

Melvin Bayne, appellant, was convicted by a jury in the Circuit Court for Baltimore City of second degree rape, child abuse, assault, assault with intent to rape, sexual offense in the third degree and sexual offense in the fourth degree. He was sentenced to fifteen years on the child abuse offense with all but ten years suspended, to a concurrent term of ten years on the second degree rape offense, and to a concurrent ten year term on the third degree sexual offense count. The trial court merged the remaining counts. Appellant presents four questions on appeal:

1. Was the evidence insufficient to establish appellant's guilt of second degree rape?

2. Did the trial judge err in failing to merge the conviction and sentence for third degree sexual offense into the conviction for second degree rape?

3. Did the trial judge improperly curtail appellant's cross-examination of the victim?

4. Did the trial judge err in finding that the statements of the alleged victim were admissible as an excited utterance?

The victim, five years old when this incident occurred, lived with her mother and appellant. In July of 1992, she was visiting the home of her uncle and aunt and their child, a male cousin. Her uncle entered the cousin's bedroom and observed the cousin (his son) on his back on a bed with the victim on top of him, "riding him in a sexual motion." The uncle accosted the victim, asked her what she was doing and "if anybody showed her [to act that way]?" She fled the room, left the house and met her grandmother, Judy, who was just arriving. After the uncle and aunt related the uncle's observations to the grandmother, the grandmother left to take the victim home.

When the victim and her grandmother arrived at the victim's house—where the appellant also resided—the victim

began to scream and would not go in. Subsequently, the victim told the grandmother what had happened; saying that appellant had touched her all over and had hurt her. The victim put her hands between her legs to indicate where she had been touched. The police were contacted and the victim was taken to the hospital.

The victim testified at trial that appellant had rubbed his "private" on her "privates." The grandmother testified that she had previously observed black and blue marks on the victim's "behind" and between her legs and had on one occasion observed appellant entering the victim's bedroom at 3:00 a.m. We shall further address the facts as we discuss the issues.

## I

### Sufficiency of the Evidence

### Second Degree Rape

■ Maryland Annotated Code article 27, section 463(a)(3) (1957 & 1992 Repl.Vol.) provides:

A person is guilty of rape in the second degree if the person engages in vaginal intercourse with another person ... [w]ho is under 14 years of age and the person performing the act is at least four years older than the victim.

"Penetration, however slight, is evidence of vaginal intercourse." Md.Ann.Code, Art. 27, § 461(g) (1957 & 1992 Repl. Vol.). Appellant contends that since the victim did not expressly testify that penetration occurred, there was insufficient evidence to convict him of second degree rape. We disagree.

In addition to those facts we have stated above, a pediatrician, qualified as an expert, testified that a physical examination revealed a stretched hymen which was "consistent with healed penetrating genital sexual injury." He also testified that there was a "small inferior labial adhesion." On cross-examination, the following occurred:

BY MR. RUBENSTEIN [Defense Counsel]:

Q   Are you saying that the findings are consistent with a sexual injury due to penetration?

A   Yes.   We're talking about penetration of the Labial plane.   So that the outer female genitalia in order for this type of stretching to occur has been penetrated....

. . . .

Q   I understood you to say there was penetration.

A   Yes, the hymen, unfortunately in this child, has been stretched and remember we talked about penetration of the labial plane.

. . . .

Q   ... Now let me ask again.   In [sic] your finding indicate penetration?

A   My finding indicated genitive penetrating injury and by definition as penetration of the labial plane.   It doesn't mean that the vagina has to be torn.

Q   But it does indicate that there was physical penetration of some sort?

A   Yes.

The court then asked the doctor:

THE  COURT:  Q.   ... [T]here was penetration?

A   ... [Y]es.

■■■ . The standard for our review of the sufficiency of the evidence is "whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bloodsworth v. State*, 307 Md. 164, 167, 512 A.2d 1056 (1986) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).   *See also McMillian v. State*, 325 Md. 272, 289, 600 A.2d 430 (1992); *Wilson v. State*, 319 Md. 530, 535, 573 A.2d 831 (1990);  and *Moore v. State*, 84 Md.App. 165, 176, 578 A.2d 304, *cert. denied*, 321 Md. 385, 582 A.2d 1256 (1990).   This standard applies to all criminal cases, including those resting upon circumstantial evidence.   *Wiggins v. State*, 324 Md. 551, 567, 597 A.2d 1359 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).

This is because, generally, "proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts." *Eiland v. State,* 92 Md.App. 56, 67, 607 A.2d 42 (1992), *rev'd on other grounds sub nom., Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993). Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder. *See Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991); and *McKinney v. State,* 82 Md.App. 111, 117, 570 A.2d 360, *cert. denied,* 320 Md. 222, 577 A.2d 50 (1990). In performing this fact-finding role, the jury has authority to decide which evidence to accept and which to reject. In this regard, it may believe part of a particular witness's testimony but disbelieve other parts of that witness's testimony. *See Muir v. State,* 64 Md.App. 648, 654, 498 A.2d 666 (1985), *aff'd,* 308 Md. 208, 517 A.2d 1105 (1986).

In sum, the evidence available to the jury was (1) the "acting out" with the victim's cousin; (2) her assertion that appellant had done the same with her; (3) that appellant had used his private to touch her private; and (4) the expert's testimony of a penetrating injury consistent with penile penetration. That evidence, if believed by the fact finder, as it apparently was, is sufficient to support the verdict that appellant was guilty of second degree rape.

## II

### Merger

We have examined the transcripts of the testimony. Though there were extensive efforts by the prosecutor to elicit from the complaining witness testimony that appellant had abused the victim on more than one occasion, those efforts were unsuccessful.

After the victim testified on direct that appellant had rubbed his "private" on her "private," she was asked:

Q. ... [D]o you remember whether Butch [appellant] ever touched you in another way that made you feel funny?

A.  No, I don't remember.

. . . .

Q  Did any other part of Butch's body touch your body?

A.  No.

Later, on redirect, she was asked how many times appellant had done "that to you." She responded, "I don't know." [1] In light of the victim's assertion that appellant touched her with his "private" on at least one occasion and her failure to remember whether there were other occasions, we must, in reviewing this issue, assume that only one assault took place and that it involved the appellant's penis penetrating the victim's genitals. We shall resolve the merger issue in that context.

We next note that the State attempts to distinguish *Snowden v. State*, 321 Md. 612, 583 A.2d 1056 (1991), from the case *sub judice* by arguing that, in the non-jury *Snowden* case, there was an "inability to determine whether the accused was subjected to separate convictions and punishment for the same act," while in the present case that problem does not exist because the "jury here was specifically informed of the definition of rape and sexual contact." The State references the court's instruction to show that the jury was given specific definitions.

We have reviewed the trial court's jury instruction; it tracks almost verbatim the language of the Maryland Criminal Pattern Jury Instruction, MPJI–Cr 4:29.8 "Sexual Offense— Third Degree Sexual Offense (Age)."

The case *sub judice* involves multiple sexual offense charges and, as we have said, the facts are insufficient to overcome the victim's testimony that she did not remember more than one incident and that she did not remember what other parts of her body he might have touched. We have examined the instruction in light of these circumstances, and an omission of

---

1.  The grandmother did state that the victim had told her at one point that appellant touched her with his "hands and everything."

a definition from the instruction may well be determinative. We explain.

The trial judge correctly instructed the jury that a third degree sexual offense requires sexual contact. He did not, however, define "sexual contact." Maryland Code Annotated article 27, section 461(f) (1957 & 1992 Repl.Vol.) defines sexual contact, in part, as including "penetration, *however slight,* by any part of a person's body, *other than the penis* . . . into the genital . . . opening . . . if that penetration can be reasonably construed as being for the purposes of sexual arousal or gratification. . . ." (Emphasis added.)

If the definition of sexual contact had been included in the court's instructions then the second degree rape and third degree sexual contact charges could have been described, under the circumstances of this case, as separate and mutually exclusive acts. An inference can be drawn that, in the absence of the definition of sexual contact, the jury is permitted to assume that sexual contact includes penile penetration. Logic dictates that, under the circumstances here, a juror could easily believe that the penile penetration described in the evidence supported the third degree sexual contact offense as well as the second degree rape offense. We shall now revisit *Snowden* and several other cases.

*State v. Boozer,* 304 Md. 98, 497 A.2d 1129 (1985), argued by the State in its brief, appears inapplicable to the problem in the case *sub judice. Boozer* was basically a double jeopardy case involving separate charging documents in which each offense was charged in a separate count. The Court noted that the apparent legislative intent was to allow separate sexual offenses to be charged for separate sexual or physical acts occurring during a single criminal happening. In the case *sub judice,* appellant argues not that the separate charges were improper, but that given the court's incomplete instructions and the facts appellant was, or may have been, convicted of a third degree sexual offense on the identical evidence of penetration that supported the second degree rape conviction.

In *Snowden,* 321 Md. at 619, 583 A.2d 1056, the Court of Appeals stated:

> We do not know whether the robbery charged was based on battery as a lesser included offense or on assault as a lesser included offense with the battery considered separate.... [H]ad it been a jury trial we could have looked to the judge's instructions in hope of illuminating the rationale behind the verdicts.... [W]e are constrained to give the Petitioner the benefit of the doubt and merge his sentence for and conviction of assault and battery into those for the robbery charge. The fundamental principle of fairness in meting out punishing requires us to so hold. See *Monoker v. State,* 321 Md. 214, 582 A.2d 525 [1990].

*Monoker* involved a charge of solicitation to commit a crime and conspiracy to commit that crime. The Court initially determined that the two offenses did not meet the required evidence test. It then held that the rule of lenity, which applies only to statutory offenses, did not apply because these were common law offenses. The Court stated that "[o]ne of the most basic considerations in all our decisions is the principle of fundamental fairness in meting out punishment for a crime.... [W]e conclude that because the solicitation was part and parcel of the ultimate conspiracy ... it would be fundamentally unfair to Monoker for us to require him to suffer twice...." *Monoker,* 321 Md. at 223–24, 582 A.2d 525 (citations omitted).

In *Biggus v. State,* 323 Md. 339, 350, 593 A.2d 1060 (1991), where a single act of digital anal penetration formed the basis for multiple convictions, the Court of Appeals noted:

> Nevertheless, when the same act or acts of the defendant constitute different criminal offenses or different degrees of the same offense, Maryland common law principles will often require that one offense be merged into the other for sentencing purposes, so that separate sentences are not imposed for the same act or acts.

*See also State v. Lancaster,* 332 Md. 385, at 409–411, 631 A.2d 453 (1993).

The Court in *White v. State*, 318 Md. 740, 744–46, 569 A.2d 1271 (1990), addressed murder and child abuse charges arising out of a single act of homicide. After discussing the required evidence test, it discussed the "rule of lenity":

> Another standard for determining merger ... has become known as the "rule of lenity." ... [T]he rule provides that doubt or ambiguity ... " 'will be resolved against turning a single transaction into multiple offenses.' "

> The Supreme Court has applied the rule of lenity where the same act constitutes an offense under two different statutory provisions....

> . . . .

> A few cases have attempted to formulate fixed criteria for deciding whether to apply the rule of lenity, and have indicated that unless two offenses merge under either the required evidence test or under these fixed criteria, there can be no merger. In our view, however, there should not be any rigid or fixed criteria for applying the rule of lenity....

> . . . .

> ... The fairness of multiple punishments in a particular statute is obviously important.

> . . . .

> Consequently, despite the possible implication to the contrary in some prior Maryland cases, we do not believe that there is any rigid framework for determining whether the rule of lenity is applicable or that the rule of lenity is the exclusive principle for determining whether offenses, separate under the required evidence test, should merge.

*Id.* at 744–47, 569 A.2d 1271 (citations omitted).

By defining sexual contact as not including penile penetration, the legislature has expressly stated that such an act cannot constitute a sexual contact for third degree sexual offense purposes. The legislature's intentions are not vague or ambiguous—they are clear. The trial court's failure to define sexual contact in its instructions permitted the jury

improperly to consider the penile penetration as satisfying the sexual contact element of the offense.

The fact that the jury was somewhat concerned about the elements of second degree rape and third degree sexual offense is apparent. The jury retired to deliberate at 4:52 p.m. on December 22nd. Later on that day it recessed and was sent home. It resumed deliberations at 9:30 a.m. on the 23rd. At 11:15 a.m. it returned to the courtroom and asked the court:

Does stretching the hymen/penetrating the labial plane constitute second degree rape? Or please clearly define, again, 2nd degree rape.

At 11:39 a.m., just twenty-four minutes after it had returned to the courtroom asking about second degree rape, it returned again to the courtroom and asked:

What are the criteria for a 3rd Degree Sex Offense?

In response to the jury's questions, the trial court did not further define sexual contact or in any way inform the jury that under the facts of this case penile penetration was excluded from consideration as an element of third degree sexual offense. It merely regave its original instructions.

We note that generally the pattern jury instructions suffice and trial judges usually may rely on them. We have not discovered any prior cases involving this pattern instruction in a similar factual context and, thus, our holding on this issue is not intended to criticize the trial court.

■ We are constrained to hold, nevertheless, that when the primary evidence of sexual misconduct is penile penetration of the female genitalia, as in the case *sub judice,* and separate charges of second degree rape and third degree sexual offense are presented to the jury, that jury must be instructed that penile penetration (in this case the penetration that supports the second degree rape charge) cannot be used as the sole evidence to support a guilty verdict on the third degree sexual offense. Put differently, in addition to the third degree sexual offense pattern instruction, the jury must be

instructed that the definition of the sexual contact element of the third degree sexual offense expressly excludes penetration by a "penis, mouth, or tongue." Md.Code.Ann. art. 27, § 461(f).

Failure to define sexual contact under the circumstances of this case is error. We are unable to say that the conviction and punishment for the third degree sexual offense was not based upon the exact same conduct which was the basis for appellant's conviction and punishment for second degree rape—conduct that, in any event, is not defined as sexual contact under the third degree sexual offense statute. As we perceive it, *Snowden, Monoker,* and *White,* to the extent they are applicable, require merger. We shall thus merge appellant's sentence for third degree sexual offense into his sentence and conviction for second degree rape.

### III

### Cross–Examination/Competency Hearing

■ A hearing was held to determine if the victim was competent to testify. Appellant contends that because the court restricted his cross-examination of the victim at the competency hearing, his right to confrontation was denied. We disagree.

There was a more extensive, but comparable, line of questioning in *Evans v. State,* 304 Md. 487, 505–06, 499 A.2d 1261 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986), a case that concerned an adult witness's competency to testify under allegations of psychiatric problems. The questions in *Evans* were propounded by the court and defense counsel; they related only to the witness's knowledge of the difference between truth and lying. The court concluded the questioning by asking the witness that if she had ever lied in a prior proceeding: "did you know that you lied?", the witness

responded, "Yes." *Id.* at 506, 499 A.2d 1261. The trial court concluded the competency hearing by stating:

That is all I wanted to know, if she knows when she is telling the truth and she knows when [she's] not telling the truth. She is a competent witness.

*Id.* Judge Eldridge, for the Court of Appeals, noted:

Although it is doubtful that any substantial question was presented concerning the competency of Sparrow to testify, as opposed to her willingness to lie when it suited her purposes, Judge ... charted a careful course and elected to voir dire the witness....

. . . .

... There was evidence that Sparrow had given various inconsistent versions ..., had lied under oath, was a prostitute and a user of drugs, ... and indicated that she would lie when it suited her purposes. At the same time ... she understood and appreciated the nature of an oath and possessed the capacity to observe and describe correctly the facts.... The issue [raised by Evans] was one of credibility, not of admissibility....

*Id.* at 508–09, 499 A.2d 1261.

The line of questions appellant attempted, in the case *sub judice,* included: "And when did he [appellant] first do something bad? How long ago was that?"; "Are these things that you're telling us, are they things you actually remember or did somebody tell you about this?"; and "Did anybody talk[ ] with you about answering these questions here today?" Eventually, after objections to these questions had been sustained, Judge Themelis ruled:

I don't think that has anything to do with regard to the competency of this person, this child, as a witness in this case.

. . . .

... It may have everything to do with ... what weight the jury is going to give her testimony. Whether they should believe or disbelieve it but it has nothing ... to do with the fact that she can relate past events ... and whether ... she knows the difference between a right and a wrong.... [That] is the whole purpose of this.

It is clear that Judge Themelis was fully aware of the purpose of the competency hearing. He was equally aware of and correctly applied the law.

Appellant cites several cases on the right of cross-examination and confrontation. These cases state the correct law appropriate to cross-examination of general witnesses at trial. A competency hearing, however, relates to a witness's ability to perceive truth as right and lying as wrong and the witness's understanding of the need for truth in the trial context. The witnesses's competency is the issue, not her anticipated trial testimony or her credibility. The competency hearing is generally restricted to its purpose, and so long as cross-examination *relevant to that purpose* is permitted, confrontation is satisfied. Full cross-examination as to credibility, materiality, and weight is subsequently available should the witness testify as a fact witness before the trier of fact. Judge Themelis did not err.

## IV

### Excited Utterance

We are faced here with a unique factual situation involving the "exited utterance exception" to the rule prohibiting the admission of hearsay evidence. The excited utterances in the case *sub judice* did not occur shortly after the offenses for which appellant stands convicted. They occurred after another, though related, traumatic event. We must thus resolve two matters: (A) whether the event generating the exited utterances has to be the criminal offense to which the utterances relate; and (B) if not, whether the utterances here qualify as exited utterances.

## The Event

The event triggering the utterance was the discovery by the victim's uncle of the five-year-old victim on top of her young cousin in the boy's bed "riding him in a sexual motion." The uncle asked her "[victim's name], what are you doing? ... [W]here have you seen this before?" Upon being discovered and questioned, the victim "panicked," ran away from the uncle's house and immediately left with her grandmother. It was this event that generated the utterances. They occurred within twenty minutes of the uncle's discovery. This event obviously was not the criminal acts for which the appellant was charged, though it precipitated the reporting and discovery of the offenses.

### A.  The Law

McCormick, *McCormick on Evidence* section 297, pp. 854–57 (Edward W. Cleary et al. eds., 3d ed. 1972), notes in respect to excited utterances that:

> [A]ll agree on *two* basic requirements [that must exist for a statement made under the influence of a startling event to qualify as an exception to the hearsay rule]. First, there must be an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes.... Second, the statement ... must have been a spontaneous reaction to the occurrence or event....
>
> The rationale ... lies in the special reliability ... furnished by the excitement suspending the declarant's powers of reflection and fabrication....
>
> ....
>
> Whether the excited utterance should be required to relate to the exciting event has occasioned a difference of opinion. *Some* cases have excluded statements for failing to meet this test.... Wigmore suggests that a requirement that the declaration elucidate the event seems to have been taken from the verbal act doctrine without adequate analysis.... While the outcome of a few cases might be different, depending on whether relation to the exciting event is

considered as a requirement or as a factor bearing on spontaneity, the former seems to be a simpler route to substantially the same destination. [Emphasis added, footnotes omitted].

Commenting on the additional requirement that the statement relate to the exciting event that caused it, Dean Wigmore observes:

If, for example, after an assault, the injured person exclaims that in the previous week the attacking party had tried to shoot him, there is perhaps no less reason for trusting that part of his utterance than any other part. Nevertheless, it is possible to argue that such utterances imply to some extent a process of reflection.... [U]tterances thus relating to some distinct prior circumstance would not be received. But this result has usually been reached by invoking the language of res gestae....

6 Wigmore, *Evidence* § 1750(c), p. 222 (Chadbourn rev.1976). He also comments, referring to spontaneous declarations, that "[t]here has been such a confounding of ideas, and such a profuse and indiscriminate use of the shibboleth *res gestae*, that it is difficult to disentangle the real basis for the principle involved." *Id.* § 1745, pp. 191–92.

*Black's Law Dictionary* 1305 (6th ed. 1990), offers as a definition of *res gestae* "literally things or things happened and therefore, to be admissible ... words ... must all be so closely connected to occurrence or event in both time and substance as to be a part of the happening.... The whole of the transaction ... and every part of it.... [I]t renders acts and declarations which constitute a part of the things done and said admissible...."

As we perceive its meaning, the language "continuing part of the transaction," has become ingrained as a part of *res gestae* law. The otherwise independent excited utterance exception has generally been included under the umbrella of *res gestae. Estep v. State,* 14 Md.App. 53, 66, 286 A.2d 187 (1972). This has created the improper perception that an excited utterance *must* be a "continuing part of the transac-

tion." It is generally cases decided in the context of *res gestae* that use language opining that a declaration must be caused by the excitement of the criminal event. Under a *res gestae* continuation of the transaction theory, a subsequent event may not qualify as a startling occurrence. Whether such a subsequent excitable event that is sufficiently related to the original offense—as it was in the case at bar—is part of a continuum is not the issue.

The primary focus in construing the excited utterance exception is not on the continuation of transaction theory applicable to *res gestae* concepts generally. Rather, the focus in construing the excited utterance exception is on the happening of *an* excitable occurrence sufficient to generate an utterance without reflective opportunity—the very concept of an excited utterance. As stated by Judge Moylan in *Cassidy v. State,* 74 Md.App. 1, 15, 536 A.2d 666 (1988):

> The doctrines [excited utterance included] to which it [res gestae] has been applied possess, all of them, a right to existence under well-recognized preexisting principles and can be explained without a resort to this phrase. . . . Whatever could be analyzed under one or another of the forms of *res gestae* can now be analyzed more clearly in a water-tight compartment of its own. The phrase *res gestae* had its day but that day is done.

Judge Moylan went on in *Cassidy* to review the various *"res gestae"* exceptions and opined that the excited utterance exception had an independent existence and should be separately considered. *Id.*

In *Cassidy,* after the infant victim underwent eight hours of medical treatment, a doctor asked her "Who did this" and she responded "Daddy." *Id.* at 6, 536 A.2d 666. Unlike the case at bar, the child was never offered as a witness and did not testify.

After discussing the various treatise writers' retreats from the term *res gestae* and their extensive comments supporting those retreats, Judge Moylan offered perhaps the simplest

and clearest definition of the excited utterance exception's *purpose* :

> The essential rationale for the Excited Utterance Exception is spontaneity arising immediately from the exciting event and not yet having abated when the utterance is made.

*Id.* at 17, 536 A.2d 666. He further noted McCormick's analysis of the time factor, *i.e.,* time between the exciting event and the utterance, stating:

> Perhaps an accurate rule of thumb might be that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process. *Testimony that the declarant still appeared "nervous" or "distraught" and that there was a reasonable basis for continuing emotional upset will often suffice.*

*Id.* (emphasis added).

Many jurisdictions in numerous cases have commented that the utterance should relate to the exciting event that generated it. In most of these cases, the criminal offense or other event that generated the excitement was also the subject of the excited utterance. The theory that a subsequent traumatic or startling event can generate excited utterances about a prior related event has been rejected by foreign jurisdictions in only a few instances. They include *State v. Walton,* 432 A.2d 1275 (Me.1981), in which the child, immediately after one sexual incident with the perpetrator, and while in a state of excitement caused by that incident, made a declaration about prior sexual offenses (as well as the current one) to her mother. The Supreme Judicial Court of Maine, applying a Maine evidentiary statute and relying on traditional *res gestae* or verbal act principles, held that the statement given must relate to the exciting event. *Id.* at 1277. See also another Maine case, *State v. Lafrance,* 589 A.2d 43, 44 (Me.1991), where the victim became upset when directed to return to the home where her mother's boyfriend, the assailant, lived, and

told a friend's mother of the prior assault. The friend's mother's testimony was ruled inadmissible. *Id.* at 46. *See also Keefe v. State,* 50 Ariz. 293, 72 P.2d 425 (1937); *Jones v. World Publishing Co.,* 512 P.2d 124 (Okla.1973).

One case indicating that a subsequent event *may* generate an excitable utterance relating to a prior event is *In re Daniel,* 456 A.2d 258 (R.I.1983). In that case, the Supreme Court of Rhode Island found error in the admission of the hearsay statement on the ground that it did not result from the original attack because there was time for reflection from that prior event and also on the ground that the subsequent event was not sufficiently startling to have generated the statement. *Id.* at 261. The young child had been attacked two days before the statement was made. On the day of the statement, he looked at photographs in a mug book with his mother and a detective present. He twice failed to identify anyone. He and his mother left and immediately he began to cry and told his mother that he had seen the appellant's picture in the mug books and that appellant was the one that attacked him. *Id.* at 260.

The Court noted that if the offense itself was the startling occurrence generating the statement, it was both too remote in time to generate the statement and provided too much opportunity for reflection to qualify it as an excited utterance. They continued:

> Furthermore, the conditions immediately preceding the identification do not support an excited-utterance exception.... When the little boy looked ... on the first try, he was inattentive. On the second try, he ... identified no one. Only on the third viewing did he identify Daniel. This is not the type of effusion or excitement which typically gives rise to a spontaneous utterance.

*In re Daniel,* at 261.

Thus, the Rhode Island court did not reject the idea that an event subsequent to the alleged criminal offense can give rise to an excited utterance relating to the prior event—it merely

held that, in that case, the second event was not sufficiently startling to satisfy the requirements of a startling event.

Other jurisdictions have expressly accepted the proposition that an excited utterance related to a prior event, which is caused by a subsequent startling event, can be admissible as an excited utterance. The facts in *Murphy Auto Parts Co. v. Ball*, 249 F.2d 508 (D.C.Cir.1957), indicate that after an accident the driver of one vehicle exclaimed that he was on an errand for company business. Appellant alleged that "under the so-called excited utterance rule such utterances are admissible only and narrowly to explain the exciting occurrence and for no other purpose." *Id.* at 510. The Court commented:

A third category of circumstances regarded as curing the want of reliability or reasonably insuring reliability is the area embraced within the spontaneous declaration, or more aptly called, the excited utterance exception. Here we are still dealing with hearsay but its want of reliability is regarded as satisfied by the circumstances in which the statement is made. The prompt, spontaneous character of the utterance under the impact and stress of the exciting event which "stills the reflective process" provides the circumstances, which, experience shows us, make for reliability.

. . . .

... If they qualify as excited utterances there is no rational basis for demanding more, since the want of reliability has been cured by the circumstances, as has been pointed out.

. . . .

We turn now to appellant's argument that the part of the alleged utterance of James Murphy tending to show that he was on an errand for his employer did not qualify as an excited utterance, because it did not illuminate the exciting event but rather went to the issue of his authority.

A majority of decided cases and authorities appear to require the presence of three elements in order for an out of court statement to qualify as an excited utterance or sponta-

neous declaration. These are (a) an exciting event (b) an utterance prompted by the exciting event without time to reflect, *i.e.*, dominated by the nervous excitement of the event, and (c) the utterance must explain or illuminate the exciting event. But a careful analysis of the entire subject demonstrates that the third element, mechanically and narrowly construed, is a spurious element, and that reliability of the utterance is not inflexibly dependent upon the subject matter of the utterance.

The test for receiving the utterance, therefore, should be whether it meets the first two requirements of a spontaneous declaration or excited utterance referred to earlier. This lies essentially with the trial court, and not unlike the evaluation of credibility is one based in part, at least, on observation of the witness, the context of the statement and all surrounding circumstances. It should be kept in mind that as soon as the excited utterance goes beyond description of the exciting event and deals with past facts or with the future it may tend to take on a reflective quality and must be more carefully scrutinized with respect to the second element, that of true spontaneity. In other words, the very fact that the utterance is not descriptive of the exciting event is one of the factors which the trial court must take into account in the evaluation of whether the statement is truly a spontaneous, impulsive expression excited by the event. Most often the excited utterance, as a practical matter, relates to the exciting cause, *i.e.*, description of an accident, an attack, etc., but if the utterance goes beyond a description of the occurrence and still meets the other tests of the excited utterance rule, we think it should be received if it is relevant. [Footnotes omitted.]

*Id.* at 510–12. *See also Wabisky v. D.C. Transit System, Inc.,* 309 F.2d 317, 319 (D.C.Cir.1962), *aff'd,* 326 F.2d 658 (1963); *Metoyer v. United States,* 250 F.2d 30, 33 n. 5 (D.C.Cir.1957); *Zibelman v. Gibbs,* 252 F.Supp. 360, 362 (E.Dist.Pa.1966); *Felder v. Pinckney,* 244 A.2d 481, 483 (D.C.App.1968); *Sawyer v. Miseli,* 156 A.2d 141, 142 (D.C.App.1959); *Jones,* 512 P.2d at 126–27.

The Supreme Court of South Dakota accepted *Murphy's* rationale in *West v. Aipperspach*, 88 S.D. 480, 221 N.W.2d 1, 3 (1974), where a similar excited utterance had been denied admittance. The court decided, however, that under the facts of that case, keeping the excited utterance out, though error, was not reversible error. *Id.*

A factual situation somewhat similar to the instant case existed in *State v. Posten*, 302 N.W.2d 638, 639 (Minn.1981), where Posten was charged with "sexual penetration of complainant under 13 years of age by [another] . . . more than 36 months older." The victim there had been living with her mother and Raymond Posten, her mother's boyfriend. On Christmas Eve, the victim's father picked her up for a visit. During the visit, she informed her father that she had vaginal discharge and that Posten had put "his thing in between her legs and stuff." *Id.* She was taken to the hospital and examined.

A nurse noticed the discharge and certain indications of trauma to the victim's genitalia as well as other marks and bruises on her thighs. A pediatrician testified that he was "'entirely convinced that some object penetrated her vagina' and that in his opinion 'she could not have done this herself with her own hand.'" *Id.* at 639.

After the victim gave a statement to the police, she was placed in a foster home. There she had frequent nightmares. During these nightmares, the victim would say, "Ray, stop. Stop it, Ray. Stop it. Stop it." *Id.* at 640. When awakened, she told her foster mother that she "thought Ray was after me." *Id.* The foster mother testified at trial to the nightmare-produced statements. Posten challenged the admissibility of those statements. The court noted that the statements induced by the nightmare's stress and excitement, though related to the nightmare, also related to the prior acts which formed the basis of the defendant's offenses. Questioning whether the specific Minnesota statute authorizing excited utterances was meant to apply to those facts, the court

affirmed on another statutory basis. The court nevertheless noted:

> The real issue is whether this evidence was sufficiently trustworthy. We believe that each case has to be considered on its own.... Here, however, we are not dealing with a conniving person who was out to get someone by faking a bad dream, but with a child who obviously had suffered. The length of time between the last of defendant's acts and the first of the sleep statements was only a few days. Finally, and we think importantly, the trial court knew that this was not the only evidence against [the] defendant and that the evidence likely was going to be used primarily for corroborative purposes [as it was in the case *sub judice* ]. If this were the only evidence connecting [the] defendant to the crime, we would say that it was insufficient to support a conviction. But it was just one of a number of items of evidence offered in support of complainant's testimony. Under all these circumstances, the error, if any, was harmless.

*Id.* at 641–42. *State v. Rogers,* 585 S.W.2d 498, 504 (Mo.App. E.D.1979), defined excited utterance as "being made shortly after an unusual occurrence, *usually* the crime involved." (Emphasis added.)

In *People v. Ojeda,* 745 P.2d 274, 275 (Colo.App.1987), the Colorado Court of Appeals noted:

> Defendant's sole argument on appeal is that the trial court erroneously admitted, as an excited utterance, hearsay testimony concerning a past conversation between the defendant and the victim.

The victim of the attempted sexual assault had been engaged in conversation by Ojeda five months before the assault. During that conversation, Ojeda had determined when the victim would be home alone and ascertained her parents' work schedules.

Immediately after the attempted assault, in an interview with an officer, the victim told him of the conversation she had had five months earlier. At trial, the officer testified to those

statements. Construing the Colorado Rules of Evidence, the Court noted that "only the slightest sort of relationship between a subject matter and the event is required." They then held

> that if the subject matter of the statement is relevant and *would likely be evoked by the startling event*, even though a portion of the statement relates to a past fact, the entire statement should be admitted. This determination cannot be made mechanically without assessing the facts of the particular case.
>
> The subject matter of the statement here is relevant *and would likely be evoked by the startling event....*
>
> Thus, even though this small portion of the victim's statement related to a past fact, it was nevertheless an excited utterance *because the significance of the past fact was revealed as a result of the excitement of the event.*

*Id.* at 276 (citations omitted, emphasis added).

In *Matter of Troy P.*, 114 N.M. 525, 842 P.2d 742 (1992), the court was called upon to determine an excited utterance's admissibility. When the child's mother attempted to take the child to her father's house, the child became upset, began to scream that she did not want to go and, when asked why not, said "[t]hat boy touches me.... Pauline's son." *Id.* 842 P.2d at 746. The court first noted that the statement had occurred several weeks after the abuse. It stated:

> "Events may so deeply traumatize a person that long after stress has subsided a chance reminder may have enormous psychological impact, causing renewed stress and excitement and educing utterances relating to the original trauma." Courts have, therefore, admitted spontaneous utterances made well after the event when the declarant was suddenly subjected to rekindled excitement.
>
> ....
>
> ... [W]e believe the imminent return of the victim to her father could support admission of her statements as an excited utterance.

*Id.* 842 P.2d at 746–47 (citations omitted). Although it determined that the declarant was not in an excited state, the Supreme Court of Washington in *State v. Chapin*, 118 Wash.2d 681, 826 P.2d 194, 197 (1992), noted that "a later startling event may trigger associations with an original trauma, recreating the stress earlier produced and causing the person to exclaim spontaneously." (Citations omitted.)

In *State v. Carlson*, 311 Or. 201, 808 P.2d 1002 (1991), Carlson's wife became upset when she heard Carlson falsely tell a police officer that the scars on his arms had been received when he was working on a car. His wife broke in and yelled, "You liar, you got ... [them] from shooting up in the bedroom with all your stupid friends." *Id.* 808 P.2d at 1004. Carlson was ultimately convicted of unlawfully possessing controlled substances. The Supreme Court of Oregon stated:

> Finally, Lisa's statement related to the startling event [the lie]. The admissibility ... is not defeated because it contains a conclusion or opinion, or accuses defendant of committing a crime.

*Id.* 808 P.2d at 1012 (citations omitted).

In *United States v. Moore*, 791 F.2d 566 (7th Cir.1986), Moore had been charged with fraud involving bid applications. A co-worker suspected that the crime had occurred but had been unable to discover evidence of it until Moore carelessly disposed of rigged bids in a trash can. When the co-worker later discovered the evidence, she called another worker over to see what she had discovered and said, "I've found the evidence I've been waiting for for a long time." *Id.* at 570. She was described as being very excited over the evidence's discovery. The co-worker died before trial and her statement was admitted as an excited utterance. The court noted:

> [C]aselaw indicates that even statements that refer to prior events or thoughts may be admissible as excited utterances.

*Id.* at 572.

In *People In Interest of O.E.P.*, 654 P.2d 312 (Colo.1982), the child had spent December 30 with her natural mother and

the mother's boyfriend. The child was returned to her temporary residence on the 31st. That evening, the temporary custodian noticed odors and inflammation around the child's vagina. Thereafter, the child had a crying spell. The child was taken to a hospital and examined. The examination disclosed injuries consistent with sexual abuse. Several days later, while looking at photographs, the child indicated her mother's and mother's boyfriend's picture and said " 'C. and P. hurt me down there,' pointing down between her legs." *Id.* at 315. The child began to cry and cried for some time. Neglect proceedings were commenced and during those proceedings the child's statement, referenced above, was admitted. In affirming, the court stated:

> [A]lthough the statement was made several days after the act of abuse, the observation ... of photographs depicting persons who subjected her to the mistreatment is the type of event which would engender substantial excitement in the child and, in this respect, constitutes an independent predicate for admitting the statement as an excited utterance.

*Id.* at 319. *But see Keefe,* 72 P.2d at 428 (when, in circumstances similar to the case at bar, the court held that the child's statement was not an excited utterance but an attempt to justify her behavior by relating the defendant's previous conduct as an excuse); *W.C.L. v. People,* 685 P.2d 176, 180 (Colo.1984); and *State v. Taylor,* 103 N.M. 189, 704 P.2d 443 (1985).

In *United States v. Napier,* 518 F.2d 316 (9th Cir.), *cert. denied,* 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975), the victim had been kidnapped in Oregon. Later, she was discovered with serious head injuries in Washington. The victim underwent two brain operations and was hospitalized for seven weeks. She was determined to be incapable of testifying at trial because, due to her brain injuries, she was unable to comprehend the significance of an oath.

One week after she returned home from the hospital and eight weeks or more after the kidnapping and attack, her sister showed her a newspaper article that contained Napier's

photograph. The victim was put into immediate "distress[,] . . . horror and upset." *Id.* at 317. The victim pointed to the picture and said, "He killed me, he killed me." *Id.* The trial court admitted the statement as a spontaneous exclamation. The Ninth Circuit Court of Appeals affirmed.

Napier, like Bayne in the case *sub judice,* argued that, because the statement "he killed me" related to the assault, the assault was the startling event—not the viewing of his photograph in the paper. Therefore, he argued, the statement was not made under the stress of the assault and it was not admissible. The court held:

> The display of the photograph, on the facts of this case, qualifies as a sufficiently "startling" event to render the statement made in response thereto admissible.

*Id.* at 318. After discussing *Wigmore* and *McCormick,* the court further noted:

> McCormick writes of the nature of the event which underlies the exception: "The courts seem to look primarily to the effect upon the declarant and, if satisfied that the event was such as to cause adequate excitement, the inquiry is ended." In the instant case where Carusa, having never discussed the assault with her family, was suddenly and unexpectedly confronted with a photograph of her alleged assailant, there can be no doubt that the event was sufficiently "startling" to provide adequate safeguards against reflection and fabrication.

*Id.* (citation omitted). See also the cases cited in our general discussion, *infra. Cf. Commonwealth v. Ramirez,* 416 Mass. 41, 617 N.E.2d 983, 1000–1001 (1993), involving a "fresh complaint" admitted only for corroborative purposes, where a child's mother, eighteen months after the last sexual assault, asked the child whether he had been raped by his scoutmaster and the child "burst into tears."

We perceive that the comments of those cases stating that the excited utterance must relate only to the startling event producing the utterance generally result from two factors: (1) in almost all cases the utterance did in fact relate to that

event, thus, the opinion writer merely related that fact; and (2) the fact that the excited utterance exception, though it had independent existence, became grouped under the aegis of *res gestae* which is grounded in a theoretical—continuing part of the transaction—foundation.

The relationship between the subsequent startling event, the excited utterance generated by it, the prior event about which the statement comments, and the time between both startling events and the statement are all relevant, especially in regard to whether the utterance is made without reflection. We see no reason, however, given the rationale for the excited utterance exception in the first instance, why a subsequent related startling event cannot be the startling event that produces an excited utterance about a prior event or why that excited utterance cannot be considered for admission under the excited utterance exception to the hearsay rule. The trial court, of course, would still have to consider all elements, including the passage of time and opportunity for fabrication or excuse, in resolving the issue of spontaneity in order ultimately to rule on admissibility.

We hold, therefore, that an otherwise qualified excited utterance that includes comments about a prior happening may be admissible under the excited utterance/spontaneous declaration exception to the hearsay evidence rule if the subsequent startling event that generates the utterance relates directly or indirectly to that prior event, *i.e.*, is likely to produce an exclamation about the prior event. Because we perceive a relationship between the subsequent and prior events in the case at bar, we frame our holding in that context. We do not now address whether that relationship between the two events is a requirement, leaving that issue for a future case. The time between the prior event, the subsequent event, and the utterance are all factors that may be considered by the trial court in determining whether the utterance is indeed a spontaneous declaration or exclamation. We note that the trial court judge is uniquely situated to make that determination.

## B.   Do the utterances here qualify as excited utterances?

### The Facts

We shall first reiterate the utterances that appellant alleges were improperly admitted and, to the extent necessary, the context in which the victim uttered them.

The infant victim was observed or caught performing simulated sexual motions upon her infant cousin and "panicked" when asked what she was doing and where she had seen such motions before.   She ran from the bedroom.   The victim was discovered with her grandmother who was just arriving at the residence.   Her uncle described her as confused.

When she approached her grandmother, the grandmother described her as "running out to me scared and upset."   The aunt and/or uncle then related the incident in the bedroom to the grandmother.   Immediately, the grandmother and victim left to go to the house where the victim and appellant both resided.   When they arrived there, the victim started screaming, "No, no, I don't want to go in."   The grandmother asked her what was wrong to which the victim continued to scream, "I don't want to go in, I don't want to go in."

They left and proceeded to a convenience store.   The grandmother asked her "what happened."   The grandmother testified in response to a question from appellant's counsel that the victim "was very upset and frightened" during the period from when they had left the uncle's house through the convenience store incident.

While at the store, the victim informed the grandmother, "Mama, I'll tell you."   At that point the grandmother "thought she was going to tell me what had happened at Butch and Gail's house.   What she had told me kind of threw me into more of a shock than I was already in because I wasn't expecting that."   The grandmother noted that at the time the victim was "very upset, very frightened[,] . . . . shaking[,] . . . crying[,] and screaming."

The grandmother then related what she had been told by the victim—the excited utterances and acts of which appellant complains. The utterances by the victim included:

I don't want to go back in the house [M]ama. Butch [the appellant] hurts me. He touches me all over, he hurts me.

The grandmother asked the victim what she meant, *i.e.,* where she was touched, and the victim put her hands between her legs. At that point, the grandmother left the store to return to the uncle's house. Enroute, they met the uncle and aunt.

The aunt testified that at that meeting on the road, the victim was still upset and scared. *All of this occurred within approximately twenty minutes of the discovery of the victim on top of her cousin.* Appellant's only complaint on appeal concerns the grandmother's testimonial recitation of what the victim related to her during this twenty-minute period, specifically that utterance we describe above.

### Additional Law

We initially incorporate our discussion of the law in section A—the cases, treatises and the quotations therefrom—into our treatment of this issue to the extent it is applicable generally.

In *Mouzone v. State,* 294 Md. 692, 452 A.2d 661 (1982), the Court of Appeals determined that a statement given five hours after the startling event was not, in fact, an excited utterance because it had occurred not only five hours after the startling event but some two hours after the declarant had been questioned about the offense by the police and because the statement's content indicated an opportunity for reflection. Nevertheless, it discussed the excited utterance exception:

The essence of the excited utterance exception is the inability of the declarant to have reflected on the events about which the statement is concerned. It requires a startling event and a spontaneous statement which is the result of the declarant's reaction to the occurrence. The rationale for overcoming the inherent untrustworthiness of hearsay is that the situation produced such an effect on the declarant as to render his reflective capabilities inoperative.

The admissibility of evidence under this exception is, therefore, judged by the spontaneity of the declarant's statement and an analysis of whether it was the result of thoughtful consideration or the product of the exciting event.

*Id.* at 697, 452 A.2d 661 (citations omitted). The *Mouzone* Court was addressing the opportunity for reflection between the startling event and the utterance it produced.

The *Mouzone* Court then discussed responses to questions as excited utterances, and stated, "[w]here the circumstances are such that they indicate that the exciting event still dominates the declarant's thought processes, then the answer to a question is admissible." *Id.* at 699, 452 A.2d 661.

We said in *Sharp v. State,* 78 Md.App. 320, 327–28, 552 A.2d 1367 (1989), in discussing *Mouzone:*

The admissibility of evidence under this exception is therefore, judged by the spontaneity of the declarant's statement and an analysis whether it was the result of thoughtful consideration or the product of the exciting event.

*See also Johnson v. State,* 63 Md.App. 485, 495, 492 A.2d 1343, *cert. denied,* 304 Md. 298, 498 A.2d 1185 (1985); *Hensley v. Rich,* 38 Md.App. 334, 341, 380 A.2d 252 (1977); *Deloso v. State,* 37 Md.App. 101 at 107, 376 A.2d 873 (1977); *Jackson v. State,* 31 Md.App. 332, 337, 356 A.2d 299 (1976); *Moore v. State,* 26 Md.App. 556 at 562–63, 338 A.2d 344 (1975); *Estep,* 14 Md.App. at 65–70, 286 A.2d 187 (discussing excited utterance as part of *res gestae* ); *Reckard v. State,* 2 Md.App. 312, 317, 234 A.2d 630 (1967), *cert. denied,* 248 Md. 734 (1968); *State v. Potter,* 423 A.2d 67, 68 (R.I.1980).

*Martin v. Commonwealth,* 4 Va.App. 438, 358 S.E.2d 415 (1987), reflective of the treatment of excited utterances in foreign jurisdictions, is also illustrative of the spontaneity factor's relative importance. The Court noted: "Moreover, particularly in the case of statements made by young children, the element of trustworthiness underscoring the spontaneous and excited utterance exception finds its source primarily in the child's lack of capacity to fabricate rather than the lack of time to fabricate." *Id.* 358 S.E.2d at 418. The Court then

opined that the declarant had been asked a question and noted that the mere asking of the question "What happened?" did not take the response out of the exception. "The natural reaction of any person arriving to aid one exposed to a startling event is to inquire, 'What happened?'" *Id.* The Court went on to note that the exception

> is grounded in the belief that the stress or excitement produced by a startling event may suspend one's powers of deliberation and fabrication thus insuring the trustworthiness of declarations prompted by the startling event.
>
> . . . .
>
> ... The issue is whether a person's statement about the facts is the product of a startling event such that it excludes the possibility that it is a fabrication.

*Id.* 358 S.E.2d at 417 (citations omitted).

We conclude by noting that in the case *sub judice*, when the aunt testified, the appellant first argued below the subsequent/prior event situation that we addressed in part A of this discussion:

> [T]he only reason the question came about, that she was found on top of somebody else. The questions weren't directed to her relationship [with appellant]. They were directed to why she was on top of somebody else....
>
> Now, how that can be an exception to the hearsay rule, I don't know.

The trial court ultimately responded on that point:

> Clearly, I think she was excited. What I'm going to do is I'm going to let you use it as an exception.

The trial judge went on to address the statement's spontaneity:

> Normally an excited utterance is just what it says. An utterance, not a response to a question.
>
> The key [however] in all statements is trustworth[iness]. I don't see where this young child had time to reflect and concoct a story between the time that she was observed by

her [uncle] and the time in which ... [the] inquiry was made as to her....

I'm going to let it in as an exception to hearsay....

Judge Themelis displayed a complete understanding of the elements making up the excited utterance-spontaneous declaration exception to the hearsay evidence rule. The utterances that appellant complains of on appeal were made within twenty minutes of the startling event while the victim was still clearly in the throes of emotion generated by the event. The trial judge did not abuse his discretion in admitting the statements. There was no error.

SENTENCE OF THIRD DEGREE SEXUAL OFFENSE VACATED; JUDGMENTS OTHERWISE AFFIRMED; COSTS TO BE PAID 80% BY APPELLANT AND 20% BY MAYOR AND CITY COUNCIL OF BALTIMORE.