737 A.2d 622

Edward THOMAS

v.

STATE of Maryland.

No. 1703, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Sept. 13, 1999.

Victoria Lansburgh, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Sandra A. O'Connor, State's Attorney for Baltimore County, Towson, on the brief), for appellee.

Submitted before SALMON, THIEME and THEODORE G. BLOOM (Retired, specially assigned), JJ.

THEODORE G. BLOOM, Judge, Retired, Specially Assigned.

Appellant, Edward Thomas, was convicted by a jury in the Circuit Court for Baltimore County (Hennegan, J. presiding) of robbery, first degree assault, second degree assault, attempted robbery, and attempt to remove a firearm from the possession of a law enforcement officer. In accordance with Maryland Code (1957, 1996 Repl.Vol., 1998 Supp.) Article 27, § 643(B)(c),[1] appellant was sentenced, as a recidivist, to a prison term of twenty-five years without parole for the robbery. He was also sentenced to a consecutive term of ten years for the first degree assault, a consecutive term of ten years for the attempt to remove a firearm from the possession of a law enforcement officer, and concurrent terms of two years on each of the other offenses. In this appeal from those judgments, appellant presents us with the following questions:

1. Did the court below err in refusing to suppress an in-custody statement made by appellant in the absence of *Miranda* warnings?

---

1. All statutory references herein shall be to Maryland Code (1957, 1996 Repl.Vol., 1998 Supp.), Article 27.

2. Did the court below err in admitting prejudicial hearsay evidence?

3. Did the court below err in allowing the State to enter a *nolle prosequi* to a charge of theft?

4. Was the evidence insufficient to sustain the charges of: (a) robbery of Alice Miller; (b) first degree assault of Allen Bleach; (c) second degree assault and attempted robbery of Douglas Irwin?

## FACTS

The following facts were adduced at trial. Alice Miller testified that, on 4 May 1998, she went to her bank at about 2:30 p.m. She parked her car in the bank's parking lot, which abutted a wooded area on one side. She completed her transaction at the bank and, as she left the building, a man came out of the woods and down a hill and said, "This is a stickup." She noticed that he had something in his hand but did not know what it was; it might have been a gun or a stick. She started screaming. The man grabbed her purse off her shoulder and, in doing so, spun her around. The man ran away, over a hill, and another man chased after him. Later, the man who chased the purse snatcher came back to the bank and said he could not catch him, but another man came in the bank and gave her purse back to her. Nothing was missing. Subsequently, the police drove her around to where they had caught the culprit; they had him on the ground and he was biting an officer. In court, Ms. Miller was not asked to identify the person who took her purse and, consequently, did not identify appellant as the culprit.

Detective Andy Essery testified that on 4 May 1998 he was with a team of about fifteen police officers, all in plain clothes, who were conducting a surveillance "on the lower end of Liberty Road in a high crime area." Essery was in a vacant apartment on Aurora Lane. At about 2:30 p.m., he observed a black male, dressed in a grey top and carrying something in his hand, run past the detective's surveillance position. Three or four seconds later, an older black male also ran past,

apparently chasing the first man, saying, "Yeah, you. You just snatched that lady's purse." Essery left the apartment and joined the second man in pursuing the first one, who was later determined to be Edward Thomas, the appellant. As they ran, Essery asked the older man what happened. The latter "replied that the subject he was chasing just grabbed a purse from the lady at the bank."

Detective Essery and the older black man chased appellant until they came to a wooded area, where Essery lost sight of appellant momentarily. Then he saw appellant again, but they were on opposite sides of a chain link fence. Appellant tried to climb the fence, but Detective Bleach, who was on the same side of the fence as appellant, pulled him to the ground. Appellant and Bleach fought, and appellant got away from Bleach just as Essery and Detective Irwin managed to get to the same side of the fence that appellant was on. Essery and Irwin tackled appellant and brought him to the ground. Appellant had no weapons of any kind on his person.

Detective Bleach testified that he, like his colleagues, was in "nondescript clothing: jeans, T-shirts, tennis shoes." At about 2:30 p.m. on 4 May 1998, Bleach was in an unmarked car in the parking lot of a church on St. Lukes Lane. He received a call from Detective Essery that someone was running and being chased by another man. Responding to that call, Bleach drove to the front of an apartment complex on Aurora Lane. When he arrived at that location, he saw two men running as had been described to him. Bleach "bailed out of his car and ran toward the first subject [appellant], asking for him to freeze," and telling him he was under arrest. Appellant started climbing over a fence, and Bleach grabbed him by the ankles and pulled him down. Appellant broke free, and the man who had been chasing him started yelling, "Don't let him go. He's the one. He's the one that did it. Don't let him go. Don't let him get away." Appellant tried to climb the fence again, but Bleach pulled him down, managed to get him on the ground in a prone position, and told him again that he was under arrest.

While Bleach was on top of appellant, attempting to subdue him, appellant sank his teeth in Bleach's left forearm. As Bleach pulled his arm away from appellant's mouth, he heard "the flesh rip" and let go of appellant. Appellant got to his feet and hit Bleach on the side of his face, and then both men exchanged punches for a couple of minutes until other officers arrived and eventually subdued appellant.

Bleach was treated at Northwest Hospital for the bite wound and other injures he sustained in the scuffle with appellant. Appellant had also been taken to the same hospital for examination and treatment. Bleach, concerned that he might have been infected with hepatitis or some other disease through the bite wound, asked appellant to give a blood sample to be tested for certain diseases that may have been transmitted. He told appellant, "I'm the detective that you bit," and that he needed to know whether appellant had any diseases. Appellant apologized for biting Bleach and said, "I didn't mean anything by that; nothing personal. You have to understand, I needed to get away." He told Bleach he would allow his blood to be taken.

Detective Bleach's trial testimony regarding his conversation with appellant at the hospital was substantially the same as his earlier testimony at a hearing on appellant's motion to suppress evidence of that conversation, which had not been preceded by advice about his *Miranda* rights, and to suppress as well the confession he made after having been given the standard *Miranda* warning.[2]

Detective Irwin testified that he was in another apartment in the area when he heard Essery's broadcast. He ran out, got picked up by another officer, and drove to the intersection of Brubar Court and Liberty Road, where he saw a black man wearing a hooded sweatshirt climbing a fence at the top of the hill. Irwin ran up the hill, and at the top he found himself on the opposite side of the fence from appellant. He saw Detec-

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tive Bleach pull appellant down from the fence and onto the ground. Bleach and appellant then "engaged in a fist fight, a street fight.... They were rolling around on the ground throwing punches, hitting each other in the face, in the upper body." Eventually, Irwin crawled under the fence and grabbed appellant, who scratched Irwin across the forehead and down across his eye. Grabbing appellant by the throat with his right hand, Irwin forced appellant to the ground, where the struggle continued. Then Irwin felt a tug on his pistol holster. He glanced down and saw that the retention strap on his holster was unsnapped. Appellant's hand was on Irwin's pistol and was removing the pistol from the holster. Irwin was able to get his pistol back in the holster and shove appellant's hand away.

Finally, Detective John Martin testified that he met with appellant at about 11:10 p.m. on 4 May 1998. He read appellant his *Miranda* rights from a printed form and had appellant sign the form acknowledging that he had been informed of and understood his rights. Appellant agreed to answer questions but declined to give a written statement. Martin then questioned appellant and made notes of the interview from which he later prepared a summary of appellant's statement.

Martin began the interview by asking appellant why he had robbed the woman. Appellant said that "he robbed her because he didn't have any money and Mother's Day was coming up and he didn't have any money in [sic] which to buy gifts for his mother, his sister, or his girl friend." He further stated:

> [H]e had left his apartment on Aurora Lane without any intention to do any robbery.
>
> But then as he was out walking around, he decided that he wanted to get some money. He saw a woman leaving the bank on the corner of Liberty Road and Sedgemore Road. And at that point he decided he was going to snatch her purse.

> ... [H]e simply approached the victim as she was entering her car, grabbed her purse off of her shoulder and then proceeded to run toward a small wooded area which is on the side of the bank parking lot.
>
> As he proceeded to run though the wooded area, he realized that he was being chased by an elderly black man who was yelling something at him, but he did not know exactly what the man was yelling.
>
> ... [H]e continued to flee which would basically be an eastbound direction in relation to Liberty Road. As he fled that way, he got to the end of a building, an apartment building.
>
> He began to turn the corner at which time he saw what he thought was a pickup truck pull up on what would be Aurora Lane. He saw a man jump out of the pickup truck and come toward him.
>
> ... [H]e ... assumed that person was also in pursuit of him. He threw the purse that he had stolen from the victim on the ground of Aurora Lane and proceeded to go through a break area in the fence.
>
> At that point, he believed that he was on the opposite side of the fence from the people who were pursuing him.

Appellant also told Detective Martin that he was running along the fence when he saw Detective Bleach coming after him, but he did not then know that Bleach was a police officer. He started to climb back over the fence, but Bleach pulled him down. Appellant decided to fight rather than submit to arrest because "he backed up eight years." When Bleach had him down on the ground, appellant decided to bite him in order to get free. After the other police officers arrived, and Detective Irwin started choking him, he realized that they were all police officers. Detective Martin initially testified that appellant said he tried to take Irwin's gun in order to get away, but on cross-examination he acknowledged that what appellant actually said was that, when Irwin was choking him, "he could not breathe, so he was going to use the gun to get out of the

choke hold." Appellant also told Detective Martin that he had no sort of weapon when he took the purse.

The older man who had pursued appellant left the scene without being identified, and the police were never able to locate him.

Appellant did not testify at trial and presented no evidence in defense of the charges, which initially included several counts that were *nolle prossed* by the State.

## I.

In his pre-trial motion to suppress, appellant contended that the statement he made to Detective Bleach at the hospital should not be admitted in evidence because it had been obtained without *Miranda* warnings. In this appeal, he asserts that the court erred in denying his motion to suppress that statement. The court also denied appellant's motion to suppress his post-*Miranda* warnings confession to Detective Martin, which appellant contended was not freely and voluntarily made. No contention is made on appeal about the ruling on that motion or the admission of the confession in evidence.

There was and is no dispute about the fact that appellant was in custody at the time Bleach approached him in the hospital and asked him to submit to a blood test. Appellant was lying on a gurney, waiting to be seen by a doctor. He had been arrested and was under police guard. It is also undisputed that no *Miranda* warning had been given to appellant. The ruling of the court at the suppression motion hearing was that the conversation between Bleach and appellant was admissible because it did not involve "interrogation."

Appellant argues that whether Bleach's purpose was to interrogate him or to obtain an incriminating admission is immaterial. He relies on *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in which the Supreme Court stated that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express

questioning or its functional equivalent." 446 U.S. at 300–01, 100 S.Ct. 1682. The Court explained:

> That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

*Id.* at 301, 100 S.Ct. 1682. (Footnote omitted.)

The Court further observed that by "incriminating response" it meant "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *Id.*, n. 5. The foregoing language in *Innis* has been quoted with approval in many subsequent cases. *See, e.g., Pennsylvania v. Muniz,* 496 U.S. 582, 600–601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), and *Arizona v. Mauro,* 481 U.S. 520, 526–27, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

In *Hughes v. State,* 346 Md. 80, 695 A.2d 132 (1997), *cert. denied,* 522 U.S. 989, 118 S.Ct. 459, 139 L.Ed.2d 393 (1997), the Court of Appeals reversed convictions for possession of cocaine with intention to distribute it, conspiracy to distribute cocaine, and related offenses, because the defendant's answer to a post-arrest processing question about whether he was a "narcotic or drug user" was introduced in evidence against him despite the fact that he had not been advised of his *Miranda* rights prior to being questioned. The Court discussed the well recognized "routine booking question" exception to *Miranda* that had been applied in this State as well as

in other jurisdictions even before the Supreme court enunciated it in *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), but concluded that it did not encompass a question on an arrest intake form as to whether the arrestee is a narcotic or drug user. The Court observed that the Supreme Court's decision in *Rhode Island v. Innis, supra,* prompted a subtle change in the application of the booking question exception. The Court then noted that, "[i]n some instances, it is plain from the nature of the question whether it is aimed at merely gathering pedigree information for record keeping purposes, or whether it is directed at procuring statements by the suspect that, either in isolation or in connection with other known facts, will tend to prove the suspect's guilt." 346 Md. at 95, 695 A.2d 132. Using language similar to that used by the Supreme Court in *Innis,* the Court of Appeals said:

> Even if a question appears innocuous on its face, however, it may be beyond the scope of the routine booking question exception *if the officer knows or should know that the question is reasonably likely to elicit an incriminating response.*

*Id.* (Emphasis added.)

In this case, Bleach said that it was not his purpose to interrogate appellant; he approached appellant in the capacity of a victim. Nevertheless, he certainly should have known, had he given it any thought, that any favorable response to his request that appellant permit a blood sample to be taken would constitute either an express or implicit acknowledgment by appellant that he had bitten the officer. Under the standard pronounced in *Innis,* therefore, Detective Bleach's request that appellant submit to a blood test constituted an interrogation, even though it was not intended as such.

That appellant, while in custody, was "interrogated" by Detective Bleach without having been "Mirandized" does not end our analysis, however. There are two judicially recognized exceptions to the application of *Miranda* that must be examined in the light of the peculiar facts of this case.

Even prior to *Miranda*, the appellate courts in California adopted what has since been referred to as the "rescue doctrine." *People v. Modesto,* 62 Cal.2d 436, 42 Cal.Rptr. 417, 398 P.2d 753 (1965), later app. 66 Cal.2d 695, 59 Cal.Rptr. 124, 427 P.2d 788, *cert. denied Modesto v. Nelson,* 389 U.S. 1009, 88 S.Ct. 574, 19 L.Ed.2d 608 (1967), involved a kidnapping. Without warning the suspect that anything he said might be used against him in court, the police questioned him about the location of the kidnapped victim. Their professed motive was to locate the victim, who might still be alive, as soon as possible. Furthermore, the officers felt that warning the suspect that any response to their questions could be used as evidence against him could have thwarted their efforts to rescue the victim. The Supreme Court of California upheld the right of the police to question the suspect before warning him, because the motive of the interrogation was to rescue the victim, not to acquire incriminating evidence. It also upheld the use of the suspect's incriminating response (revealing the whereabouts of the victim) as evidence against him.

Subsequent to the *Miranda* decision, *People v. Dean,* 39 Cal.App.3d 875, 114 Cal.Rptr. 555 (4 th Dist.1974), applied the rescue doctrine in another kidnapping case, affirming a conviction based, in part, on the defendant's inculpatory response to questions—without prior *Miranda* warnings—designed to find and rescue the kidnapped victim. The court held that, even after *Miranda,* the *Modesto* rescue doctrine was still a vital part of the law of California. The doctrine was discussed and described in *People v. Riddle* (2d Dist.1978), 83 Cal.App.3d 563, 148 Cal.Rptr. 170, *cert. denied* 440 U.S. 937, 99 S.Ct. 1283, 59 L.Ed.2d 496 (1979). In that case, a prosecution for kidnapping and murder, the court explained that the doctrine requires the existence of the following elements:

1. urgency of need, in that no other course of action promised relief;
2. the possibility of saving a human life by rescuing a person whose life was in danger; and

3. the rescue was the primary purpose and motive of the interrogators.

The rescue doctrine, as explained in *Riddle,* was approved and followed in *People v. Willis,* 104 Cal.App.3d 433, 163 Cal.Rptr. 718, 9 A.L.R.4th 578 (2d Dist.1980), *cert. denied* 449 U.S. 877, 101 S.Ct. 222, 66 L.Ed.2d 99 (1980). *See also* annotation in 9 A.L.R.4th 578.

Analogous to the California rescue doctrine is the public safety exception announced in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In that case, a woman approached two police officers, asserting that she had just been raped. She described her assailant and told the police that he had a gun and that he had just entered the nearby supermarket. While one officer went to call for assistance, the other entered the supermarket and spotted a man who fit the description of the assailant. That man turned and ran toward the rear of the store, and the officer followed him but lost sight of him for a moment. The officer eventually caught up with the suspect, stopped him, and frisked him. The suspect was unarmed, but he was wearing an empty shoulder holster. The officer arrested and handcuffed the suspect and, without taking the time to read him his *Miranda* "rights," asked, "Where's the gun?" The suspect nodded his head in the direction of a counter and said, "Its over there behind that counter." The gun was retrieved and the suspect was charged with illegal possession of a handgun.

The New York Supreme Court granted the defendant's motion to suppress his initial statement to the arresting officer, a statement made later after receiving the standard *Miranda* warning, and the gun. The Appellate Division of the New York Supreme Court and the New York Court of Appeals affirmed the suppression order, but the United States Supreme Court, in a five to four decision, reversed. The majority adopted a public safety exception to the *Miranda* requirement that no statement made by a suspect in police custody before being told his rights, as set forth in *Miranda,* may be used in evidence against the suspect. Justice Renquist, writing for the Court, stated:

> For the reasons which follow, we believe that this case presents a situation where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda.*

467 U.S. at 653, 104 S.Ct. 2626. (Footnote omitted.)

The Court noted that the case presented no claim that the respondent's statements were actually compelled by police conduct that overcame his will to resist and that the only issue before it was whether Officer Kraft was justified in failing to advise the respondent of "the procedural safeguards against compulsory self-incrimination since *Miranda.*" Stating that the facts of the case came within the ambit of the *Miranda* decision as it had subsequently been interpreted, and that the respondent was in police custody when he responded to the officer's question concerning the location of the gun, the Court held:

> [O]n these facts there is a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved. In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer. Undoubtedly most police officers, if placed in Officer Kraft's position, would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect.
>
> Whatever the motivation of individual officers in such a situation, we do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety. The *Miranda* decision was based in large part on this Court's view that

the warnings which it required police to give to suspects in custody would reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation in the presumptively coercive environment of the station house....

The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear the cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether

> it best serves society for them to ask the necessary questions without the *Miranda* warnings, and render whatever probative evidence they might uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.
>
> In recognizing a narrow exception to the *Miranda* rule in this case, we acknowledge that to some degree we lessen the desirable clarity of that rule.... As we have in other contexts, we recognize here the importance of a workable rule "to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." But as we have pointed out, we believe that the exception which we recognize today lessens the necessity of that on-the-scene balancing process. The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

467 U.S. at 655–59, 104 S.Ct. 2626. (Citations and footnote omitted.)

The dissenting opinions asserted that a public safety exception to *Miranda* is unnecessary because in every case an officer can simply ask the necessary questions to protect himself and the public without the prosecution introducing any incriminating responses at a subsequent trial. Justice O'Connor, in a separate opinion, dissented in part (to the holding that Quarles's initial response to the officer's question, "Where's the gun?" was admissible) and concurring in part (to the holding that the gun was admissible). She pointed out that the public should bear the costs—inadmissibility of the response to a question asked prior to *Miranda* warnings—when the question is asked for the purpose of protecting public safety, just as it bears the costs of exclusion of incrimi-

nating evidence in order to preserve the Fifth Amendment protection against compelled self-incrimination that the *Miranda* prophylactic rule was designed to enhance. In a footnote, the majority opinion rejected those arguments of the dissenters, stating:

> [A]bsent actual coercion by the officer, there is no constitutional imperative requiring the exclusion of the evidence that results from police inquiry of this kind; and we do not believe that the doctrinal underpinnings of *Miranda* require us to exclude the evidence, thus penalizing officers for asking the very questions which are the most crucial to their efforts to protect themselves and the public.

467 U.S. at 658, n. 7, 104 S.Ct. 2626.

The language employed by the Court in adopting the public safety exception to *Miranda*—"We think police officers can and will distinguish almost instinctively between questions necessary to secure their *own safety or the safety of the public* and questions designed solely to elicit testimonial evidence from a suspect" (*Id.* at 658–59, 104 S.Ct. 2626); and "... we do not believe that the doctrinal underpinnings of *Miranda* requiring us to exclude the evidence, thus penalizing officers for asking the very questions which are the most crucial to their efforts *to protect themselves and the public* " (*Id.* at 658, n. 7, 104 S.Ct. 2626)—indicates that the Court equated police safety with public safety. (Emphasis added.)

The argument set forth in the dissenting opinions—that public safety concerns justify asking questions such as "Where's the gun" without first advising the suspect of his *Miranda* rights, but do not justify the use of the suspect's response as testimonial evidence against him—has a logical ring to it. Professor Martin R. Gardner, of the University of Nebraska College of Law, in his article entitled "*The Emerging Good Faith Exception to the Miranda Rule—A Critique,*" 35 Hastings L.J. 429 (1984), expressed much the same thought as the dissenters in *Quarles* in criticizing the evidentiary use of a suspect's pre *Miranda* warning response to questions under the analogous rescue doctrine:

> While interrogating unwarned suspects in order to save lives may be proper police conduct, it does not follow that *Miranda* provides no bar to the admissibility of evidence obtained through such interrogation. The privilege against self-incrimination is not negated by the concession that police interrogation of unwarned suspects is justified. Far from "negated," the *Miranda* rule is not even implicated until the government attempts to use the tainted evidence. Therefore, it follows that "the police may in fact acquire the life saving information, so long as they do not attempt to use it to prosecute the defendant." (Footnotes omitted.)

35 Hastings L.J. at 472–73.

Nevertheless, *Quarles,* which holds that the public safety exception negates *Miranda* and permits the evidentiary use of a defendant's response to interrogation prior to his being informed of his *Miranda* rights if the interrogation comes within the exception, is still the law. This Court followed and applied it in *Hill v. State,* 89 Md.App. 428, 598 A.2d 784 (1991).

We perceive no doctrinal difference between a question that would fall within the rescue doctrine ("Where is the [kidnapped] child?") or the public safety exception based on the need to secure the protection of either the public generally or the officer himself ("Where's the gun?") and Detective Bleach's request that appellant submit to a blood test to determine if he had a disease that he might have transmitted to the officer by biting him. If appellant had a disease such as AIDS or hepatitis, it was important that Detective Bleach be informed of it quickly in order that he might (*l* )undergo prompt treatment and (2) take steps to avoid infecting others, particularly members of his family.

We hold, therefore, that the conversation between Detective Bleach and appellant at the hospital to which both of them had been taken for treatment falls within the public safety exception to the *Miranda* exclusionary rule and, therefore, that the court below did not err in allowing the substance of that conversation to be admitted in evidence.

Moreover, we do not perceive any harm or prejudice to appellant from the admission of that evidence. Not only did Detective Bleach testify about his struggle with appellant, including the biting, and exhibit the bite wound to the jury, but appellant's subsequent confession, which included the biting incident as well as the purse snatching, was also admitted in evidence. The admission of that confession is not challenged in this appeal, and, indeed, even if the hospital conversation had been excluded, appellant's confession after receiving the standard *Miranda* warning would have been admissible in the absences of evidence that either it or the hospital conversation had been coerced. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), in which the Supreme Court held that a subsequent confession after *Miranda* warnings was not rendered inadmissible by prior uncoerced remarks in response to interrogation without *Miranda* warnings.

## II.

Detective Essery was permitted to relate, over objection, three comments made by the "older" man who was chasing appellant:

(1) As both men ran past him, Essery heard the older man say, "Yeah, you. You just snatched that lady's purse."

(2) Joining in the chase, Essery asked the older man what had happened, and the man replied "that the subject he was chasing just grabbed a purse from the lady at the bank."

(3) As Detective Bleach was trying to pull appellant down from the fence, the older man excitedly said to Bleach, "Don't let him go. He's the one. That's the one that did it. Don't let him go. Don't let him get away."

Appellant contends that what the unidentified older man said was inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801(c). Essery's testimony about what he heard the older man say obviously fits

the definition of hearsay: statements made by someone other than the witness who was testifying and offered to prove the truth of the matter asserted, *i.e.*, that the man being chased by Essery and the declarant had stolen a lady's purse. The court admitted the out-of-court declarations of the older man as "excited utterances." Md. Rule 5–803 sets forth certain exceptions to the hearsay rule, *i.e.*, statements not excluded under the hearsay rule. Among those exceptions is an excited utterance, defined in Section (b), subsection (2) of Rule 5–803 as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Detective Essery's description of the declarant's excited demeanor was certainly an adequate basis for the court to conclude that the declarant was under the stress of excitement caused by the startling event he was relating.

Appellant concedes that the declarant was excited, but he argues that there is no independent evidence of the startling event, and that startling event cannot be proved by the excited utterance. Appellant concedes that there was evidence that a purse snatching had occurred—Alice Miller testified that a man snatched her purse—but, as appellant points out at trial, she was not asked to and did not identify appellant as the purse snatcher. Appellant confessed that he had stolen a lady's purse and he was running away from the scene of the crime when he was being chased by the unidentified older man and Detective Essery. There was evidence of the startling event, independent of the out-of-court declarations by the older man: a purse snatching that caused the declarant to chase appellant.

Appellant's argument to this Court appears to be that, despite independent evidence of the startling event that produced the excited utterance, there was a possibility that the purse snatching appellant confessed to, and for which he was being chased, was not the alleged robbery of Alice Miller for which he was being tried. Because of that possibility, appellant asserts, the excited utterance may not have referred to

this case, and, therefore, the out-of-court declarations were hearsay and should have been excluded.

In our view, appellant's argument misses the mark in two respects. First, the excited utterance exception to the hearsay rule is based on the theory that such an utterance has a sufficient inherent guarantee of trustworthiness, so as to allow its admission in evidence despite the fact that it is hearsay. Consequently, whether the startling event that produced the excited utterance is the same event for which appellant was being tried has no bearing on whether the declaration is an excited utterance and thus is not excluded by the hearsay rule. If the startling event that produced the excited utterances was the coincidental snatching of a purse from someone other than Alice Miller, lack of relevancy might have been a basis for excluding the evidence, but that basis for excluding the evidence was not asserted below or on appeal. Second, and more important, in this case the circumstances not only permitted, but almost required, the trier of fact to infer that it was Alice Miller's purse that appellant confessed to taking and, therefore, the basis for the excited utterance.

Appellant snatched a lady's purse and ran away, up a hill and into a wooded area. He was chased by another man who was joined by a police officer. During the chase he abandoned the purse. Eventually, he was captured after a struggle during which he bit Detective Bleach while both of them were on the ground. Alice Miller's purse was snatched off her shoulder while she was on the parking lot of a bank. On one side of the parking lot, she testified, there were woods, and the man who took her purse "came over the hill out of the woods." He ran away, "back up the hill," with another man chasing him. Later, someone came into the bank and returned her purse to her; its contents were intact. Thereafter, she testified, "And they drove me around where they caught the gentleman. And they wanted—they had him on the ground, and he was biting the officer." That it was Ms. Miller's purse that appellant stole is an inescapable conclusion. Accordingly, we perceive no error in permitting Detective Essery to relate the unidentified man's excited utterances.

III.

Appellant was originally charged, in separate counts, with robbing Alice Miller and with theft from her. Before the case went to the jury, the State entered a *nolle prosequi* to the theft count, over appellant's objection.

Relying on *Hook v. State,* 315 Md. 25, 553 A.2d 233 (1989), appellant contends that the trial court erred in permitting the State to *nolle pros* the theft charge. In *Hook,* the Court of Appeals held that, "[w]hen the defendant is plainly guilty of some offense, and the evidence is legally sufficient for the trier of fact to convict him of either the greater offense or a lesser included offense, it is fundamentally unfair under Maryland common law for the State, over the defendant's objection, to *nol pros* the lesser included offense." *Id.* at 43–44, 553 A.2d 233.

As the Court noted in *Burrell v. State,* 340 Md. 426, 667 A.2d 161 (1995), *Hook* was "clarified" in *Jackson v. State,* 322 Md. 117, 586 A.2d 6 (1991), wherein the Court held that "the State is not precluded from entering a *nolle prosequi* of [a lesser included] offense if, under the particular facts of the case, there exists no rational basis by which the jury could conclude that the defendant is guilty of the lesser included offense but not guilty of the greater offense." The present test, as set forth in *Burrell,* 340 Md. at 434, 667 A.2d 161, is:

> In considering whether an entry of nolle prosequi to a lesser included offense is unfair to the defendant, it is not enough to determine that the evidence would be sufficient for the jury to convict on that offense; rather, the evidence must also be such that the jury could rationally convict *only* on the lesser included offense. If there is no rational basis for the jury to convict a defendant of the lesser offense without also convicting of the greater offense, the State may use its discretion to withdraw that verdict option from the jury by nolle prossing the lesser included offense.

*Id.* (Emphasis supplied.)

Appellant argues that "[t]he jury could have rationally found that the instant crime against Alice Miller was not

robbery, but theft." As the Court of Appeals pointed out in *West v. State,* 312 Md. 197, 202, 539 A.2d 231 (1988):

> Robbery retains its common law definition in Maryland, though the penalty for this crime is fixed by statute. *See* Md.Code (1957, 1987 Repl.Vol.) [3] Art. 27, § 486. We have defined the offense as the felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence or putting in fear . . .; or, more succinctly, as larceny from the person, accompanied by violence or putting in fear. (Citations omitted.)

Appellant concedes that Ms. Miller's testimony, to the effect that appellant said, "This is a stick-up," coupled by the fact that she saw something in his hand that could have been a stick or a gun, and that she screamed, indicates that appellant frightened her. That testimony was not refuted, contradicted, or even challenged. Indeed, defense counsel, in cross-examining Ms. Miller, never broached that subject. Nevertheless, appellant contends that he did not accomplish the theft of the purse by putting her in fear because she did not surrender the purse to him; he snatched it; and purse snatching, he asserts, is theft, not robbery.

Appellant's contention is similar to that made by the petitioner in *West v. State, supra.* Our focus therefore, as was the Court's focus in *West,* is on the requirement that the larceny or theft be accompanied *by* violence or putting in fear. We note that the Court in *West* did not distinguish theft "*by* violence or putting in fear" from theft "*accompanied by* violence or putting in fear." Indeed, the Court appears to have regarded the two expressions as having identical meanings.

> The requirement that the larceny be accompanied by violence or putting in fear has ancient origins in the common law. In William Hawkins' *Treatise of the Pleas of the Crown,* published in 1724, in the chapter entitled "Of Robbery," it is said:

---

3. Now 1996 Replacement Volume.

"Sect. 2. Larceny from the Person of a Man either puts him in Fear, and then it is called Robbery; or does not put him in Fear, and then it is called barely, Larceny from the Person.

Sect. 3 Robbery is a felonious and violent Taking away from the Person of another, Goods or Money to any Value, putting him in Fear."

John Latrobe's *Justice under the laws of Maryland*, published in 1826, is evidence of the early adherence in Maryland to this requirement, for Section 1252 of the authority states:

"Open and violent larceny from the person, or *robbery*, is the felonious and forcible taking from the person of another, of goods or money to any value, by violence, or putting in fear. The putting in fear distinguishes it from other larcenies. 4 *Blanc. Comm.*" *Id.* at 284.

Merely affirming the antiquity of this requirement, of course, leaves unanswered the question of the degree of violence or putting in fear that is requisite. We have not previously considered this precise question. A number of cases decided in the Court of Special Appeals, however, provide a framework for making the necessary determination of degree. *Cooper v. State,* 9 Md.App. 478, 265 A.2d 569 (1970) is particularly apposite. The prevailing view among other jurisdictions also points to a clear answer.

312 Md. at 203–04, 539 A.2d 231.

There is a logical basis for equating theft *accompanied by* violence or putting in fear with theft *by* violence or putting in fear. What distinguishes robbery from theft is the use of force or threat of force to overcome resistance. The taking of property from the person of another, *accompanied either by* force sufficient to overcome resistance or by putting the victim in sufficient fear to refrain from resistance is the same as taking by violence or putting in fear. If the victim, put in fear by such words as "This is a stick up," uttered by one carrying an object that appears to the victim to be a possible weapon,

does not resist the taking of her property, the theft *accompanied by putting* in fear is a theft *by putting* in fear.

In view of the uncontradicted and unchallenged evidence that appellant's theft of Ms. Miller's purse was accompanied by, and therefore accomplished by, putting her in fear, there was no rational basis for the jury to convict appellant of theft without convicting him of robbery.

We hold, therefore, that the trial court did not err in permitting the State to *nolle pros* the count charging appellant with theft of Ms. Miller's property.

IV.

Appellant asserts that the evidence was insufficient to sustain his convictions for robbery of Alice Miller, first degree assault on Detective Bleach, or second degree assault on or attempted robbery of Detective Irwin.

In assessing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). A purpose of this rule is to give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* "*[A]ll of the evidence* is to be considered in the light most favorable to the prosecution." *Id.* (Emphasis in original; footnote omitted). Judging the credibility of witnesses and resolving conflicts in, and measuring the weight of, the evidence are tasks properly for the trier of fact. *Hammond v. State,* 322 Md. 451, 463, 588 A.2d 345 (1991); *Snyder v. State,* 104 Md.App. 533, 549, 657 A.2d 342 (1995); *McKinney v. State,* 82 Md.App. 111, 117, 570 A.2d 360, cert. denied, 320 Md. 222, 577 A.2d 50 (1990). In performing its function, the jury is free to accept the evidence that it believes and reject that which it does not believe. *Muir v. State,* 64 Md.App. 648, 654, 498 A.2d 666 (1985), *aff'd,*

308 Md. 208, 517 A.2d 1105 (1986). In other words, the jury "may believe part of a particular witness's testimony but disbelieve other parts of that witness's testimony." *Bayne v. State,* 98 Md.App. 149, 155, 632 A.2d 476 (1993).

A.

Appellant points out that Ms. Miller made no identification of the man who took her purse; that none of the police officers who participated in the arrest of appellant testified to any facts or circumstances linking appellant's admitted purse snatching to the possibly coincidental but unrelated theft of Ms. Miller's purse; that Ms. Miller never even mentioned what bank she was leaving when she was accosted, where the bank was located, or even the approximate time of the offense; that the older man who chased appellant was never identified, never testified, and thus never connected the purse snatching he observed with the taking of Ms. Miller's purse; and that, although appellant confessed to taking someone's purse, there was no evidence that the purse he took was Ms. Miller's. From those facts, appellant concludes that the assumption that appellant was chased by the unknown man because he took Ms. Miller's purse is unwarranted and, therefore, the evidence did not tend to prove guilt beyond a reasonable doubt.

We believe that our discussion in Part II of this opinion refutes appellant's contention. As we pointed out in response to appellant's arguments concerning the admission of excited utterances, the totality of the evidence not only permitted but almost required the trier of fact to infer that it was Alice Miller's purse that appellant confessed to taking.

B.

Appellant was convicted of having committed a first degree assault on Detective Bleach, in violation of Md.Code, Art. 27, § 12A–1. That statute provides, in subsection (a)(1), that a person may not intentionally cause or attempt to cause serious physical injury to another, and, in subsection (b), that

a person who violates the section is guilty of the felony of first degree assault and on conviction is subject to imprisonment for not more than 25 years. Section 12 of Article 27, which contains definitions of terms used in § 12A (second degree assault) and § 12A–1 (first degree assault), defines "serious physical injury" as physical injury that:

(1) Creates a substantial risk of death;

(2) Causes serious permanent or serious protracted disfigurement;

(3) Causes serious permanent or serious protracted loss of the function of any bodily member or organ; or

(4) Causes serious permanent or serious protracted impairment of the function of any bodily member organ.

Although Detective Bleach sustained some painful injuries in his struggles with appellant, the only serious injury that was intentionally inflicted on him was the bite wound, which could be counted as "serious physical injury" only if the wound left him with a serious permanent or protracted disfigurement. There was certainly nothing in the evidence to indicate a serious risk of death or permanent or protracted loss of function or impairment of function of any bodily member or organ. Appellant argues that, although the wound produced a scar, that scar did not amount to a serious disfigurement.

"Disfigurement is generally regarded as an externally visible blemish or scar that impairs one's appearance." *Scott v. State,* 61 Md.App. 599, 608, 487 A.2d 1204 (1985). Detective Bleach exhibited his wounded arm to the jury, which was instructed by the court on the statutory definition of "serious physical injury" as the critical factor in the offense of first degree assault. We did not see the scar; therefore we cannot say that reasonable jurors who did see it could not conclude that it was a serious permanent or protracted disfigurement. Consequently, we have no basis for concluding that the trial court should have granted appellant's motion for acquittal on the first degree assault charge.

C.

### 1. Second Degree Assault

Appellant's contention of evidentiary insufficiency to support the conviction for second degree assault on Detective Irwin was not preserved for appellate review. In arguing his motion for judgment of acquittal, appellant's trial counsel submitted on that count, without particularizing the basis for the motion as to that charge. Failure to particularize a motion for judgment of acquittal waives appellate review of evidentiary sufficiency. *State v. Lyles,* 308 Md. 129, 135, 517 A.2d 761 (1986). *See also Moosavi v. State,* 118 Md.App. 683, 700–02, 703 A.2d 1302 (1998) in which Judge Moylan, writing for this Court, explained the need for particularity on a motion for a judgment of acquittal and then listed and summarized several cases illustrating the principle that a failure to present a particularized argument in favor of the motion constitutes a failure to preserve the issue for appellate review and thus waives review.

In any event, the testimony of Detective Irwin that, when he attempted to take hold of appellant, appellant, using his left hand "kind of in an open, not a full fist, but in a kind of open—like a cat almost," scratched Irwin across the forehead and then across his eye was more than sufficient to sustain the assault conviction.

### 2. Attempted Robbery

> An attempt to commit a crime is, in itself, a crime. A person is guilty of an attempt when, with intent to commit a crime, he engages in conduct which constitutes a substantial step toward the commission of that crime.

*Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988), citing *Cox v. State,* 311 Md. 326, 329–31, 534 A.2d 1333 (1988) and *Young v. State,* 303 Md. 298, 311, 493 A.2d 352 (1985).

The testimony of Detective Irwin was certainly sufficient to support a conviction for an attempt to commit a crime by taking the officer's pistol. But what crime, other than that

of removing a firearm from the possession of a law enforcement officer,[4] did appellant attempt to commit? No contention was made below or on appeal that there was no evidence of *animus furandi, i.e.,* intent to steal, or feloniously to deprive the owner permanently of his property, an essential element of the common law crime of larceny, which is now subsumed in Maryland's theft statute. (We need not here consider whether an intent to deprive the owner of his property *permanently* is an essential element of robbery.) In any event, there was certainly a reasonable inference of *animus furandi;* since appellant wanted to take the gun in order to escape arrest, it is unlikely that he intended to return the weapon.

It is appellant's contention that attempted robbery, like robbery, requires the use of force to effect a theft, and he argues that the only evidence of force was his struggle with Irwin, which was not over possession of the gun. Because the struggle, and therefore the force, was to effect an escape, he asserts, the attempt to take the gun was incidental to, and not part of, the use of force.

What appellant overlooks, however, or simply ignores, is that Detective Irwin testified that he felt a tugging on his holster, looked down, and observed that appellant was in the process of removing the pistol from the holster after having unsnapped the holster's retention strap. Irwin was required to use force to prevent appellant from taking the gun; he grabbed appellant's hand and forced the gun, which was in appellant's hand, back into the holster. Even if there had been no other force involved in the attempt to take the pistol, the officer's resort to force in order to thwart the taking

---

4. Md.Code (1957, 1996 Repl.Vol.) Art. 27, § 36A–1 makes it a felony and authorizes the imposition of a substantial penalty for removing or attempting to remove a firearm from one he knows or has reason to know is a law enforcement officer who is lawfully acting within the scope of his employment. Subsection (C) of § 36A–1 provides that a sentence imposed under that section may be imposed separately from and either consecutive to or concurrent with a sentence for any offense based on the act or acts establishing the offense under that section.

elevated appellant's offense from mere attempted theft to attempted robbery.

Snatching a purse or picking a pocket, if done so skillfully that it involves no more force than is necessary to remove the property, is theft, not robbery. The distinction, often difficult to apply, is explained by the text writers in similar language. LaFave and Scott, Criminal Law § 8.11(1) (2d ed.1986), states that the great weight of authority supports the view that there is not sufficient force to constitute robbery when the thief snatches property from the owner's grasp so suddenly that the owner cannot offer resistance to the taking. The text continues:

> On the other hand, when the owner, aware of an impending snatching, resists it, or when, the thief's first attempt being ineffective to separate the owner from his property, a struggle for the property is necessary before the thief can get possession thereof, there is enough force to constitute robbery. Taking the owner's property by stealthily picking his pocket is not taking by force and so is not robbery, but if the pickpocket or his confederate jostles the owner, or if the owner, catching the pickpocket in the act, struggles unsuccessfully to retain possession, it is robbery.

In Lewis Hockheimer's treatise, The Law of Crimes and Criminal Procedure § 432 (2d ed.1904), the same concept is expressed more succinctly:

> A mere sudden snatching from the person of another is not robbery; but if the taking is either resisted by the opposition of the possessor, or the thing is so attached as to the person or clothing as of itself to create resistence, however slight, the offense is robbery.

Clark and Marshall, A Treatise on the Law of Crimes § 12.13 (7th ed.1967), after explaining that the mere force that is required to take possession when there is no resistance is not enough to constitute robbery, states, "Robbery is committed if there is any struggle to retain possession or if there is any injury or actual violence to the owner in the taking."

We hold, therefore, that the evidence, particularly the testimony of Detective Irwin describing his observations of appellant's attempt to take his pistol and his own reaction to that attempt, was sufficient to sustain appellant's conviction for attempted robbery.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**